**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| RICHARD LANGBECKER, on behalf of himself and all others similarly situated, | : : : |
| Plaintiffs, | : : |
| vs. | : : |
| ELECTRONIC DATA SYSTEMS CORP., JOHN ADAMS, RICHARD BROWN, JAMES E. DALEY, JEFFREY M. HELLER, MICHAEL MILTON and UNKNOWN FIDUCIARY DEFENDANTS 1-100, | : : : : : |
| Defendants. | : : |

Civil Action No. _____

4:02CV346

CLASS ACTION COMPLAINT

Plaintiff Richard Langbecker, a participant in the Electronic Data Systems Corporation EDS 401(k) Plan (the "Plan"), on behalf of himself and a class of all others similarly situated, alleges as follows:

**INTRODUCTION**

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, on behalf of the Plan, a 401(k) plan established and sponsored by Electronic Data Systems Corporation ("EDS" or the "Company") as a benefit for its employees.

2.    401(k) plans confer tax benefits on participating employees as an incentive to save for retirement and/or other long-term goals.  An employee participating in a 401(k) plan frequently has the option of purchasing the common stock of his employer as part of his 401(k) plan.

3.      In their capacity as sponsors, administrators or other fiduciaries of the Plan, defendants owe duties to participants and beneficiaries of the Plan, including plaintiff and members of the Class.

4.      Plaintiff Richard Langbecker was an employee of EDS for 23 years and a participant in the Plan. Plaintiff's 401(k) investment portfolio included EDS stock.

5.      Plaintiff alleges that defendants, fiduciaries of the Plan, breached their fiduciary duties to him and to the other participants and beneficiaries of the Plan, in violation of ERISA § 409, 29 U.S.C. § 1109, particularly with regard to the Plan's holdings of EDS stock. Plaintiff alleges that defendants are liable under ERISA for the losses suffered as a result of defendants' breaches of their fiduciary obligations.

6.      Defendants breached their duties of prudence, care and loyalty by, *inter alia*, imprudently permitting and/or causing the investment of the Plan assets in overvalued EDS stock; failing to provide participants with complete and accurate information regarding the risks associated with investing in EDS stock; encouraging employees to invest their retirement monies in EDS stock without disclosing that, because of EDS's true financial condition, it was imprudent for employees to maintain a concentrated investment in EDS's common stock as part of their 401(k) investment portfolio; and failing to ensure diversification in the Plan's assets. EDS also matched the participants' contributions, at certain specified percentages, by making contributions to the participants' accounts in EDS stock.

7.      Because his claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes a participant such as plaintiff to sue for plan-wide relief for breaches

of fiduciary duty, he brings this action on behalf of himself and all the participants and

beneficiaries of the Plan during the relevant period.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some defendants reside in this

district. In addition, EDS is headquartered in this district.

## THE PLAN

10.     The EDS 401(k) Plan is an "employee pension benefit plan," as defined by section

3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). Further, the Plan is an "eligible individual account

plan" within the meaning of section § 407(d)(3) of ERISA, 29 U.S.C. § 1107(d)(3), and is a

"qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. §

401(k). The relief requested in this action is for the benefit of the Plan and it

participants/beneficiaries.

11.     Upon information and belief, the Plan is sponsored by EDS Corporation.

12.     Participants in the Plan are permitted to contribute up to 20% of their total

compensation to the Plan, with a maximum annual contribution for 2001 of $10,500.

Participants directed the investment of their contributions to the various investment options

available in the Plan. Included in the available investment options was EDS stock.

13.     Additionally, the Company matched 25% of employee contributions up to 6% of an employee's salary, in EDS stock. However, employees were restricted from trading this employer match of EDS stock for a period of two years.

14.     Upon information and belief, defendants include named and de facto fiduciaries with respect to the Plan. All defendants exercised discretionary authority or control regarding management of the Plan; management of the Plan's assets; and/or administration of the Plan.

## PARTIES

### Plaintiff

15.     Plaintiff is a resident of Texas. Plaintiff worked for EDS for 23 years and is a participant in the Plan pursuant to section 3(7) of ERISA, 29 U.S.C. § 1102(7). As of October 16, 2002, plaintiff held in excess of 12,400 shares of EDS stock in his 401(k) investment portfolio.

16.     Shares of EDS stock in the EDS Stock Fund represent a substantial portion of plaintiff's total savings in the Plan.

17.     Employees of EDS, including plaintiff and members of the Class, lost millions of dollars when the value of the Company's shares plummeted in value.

### Defendants

18.     Defendant EDS is incorporated in the state of Delaware and maintains its corporate headquarters at 5400 Legacy Drive, Plano, Texas 75024-3105. According to the Company, EDS is a leading global services company, providing strategy, implementation and hosting for clients managing the business and technology complexities of the digital economy, with revenues in 2001 of $21.5 billion dollars.

4

19.     Defendant John Adams ("Adams") served as EDS' Vice President and Controller during Fiscal Year 1999. Adams also signed EDS's Form 11-K, filed with the SEC, representing that he was the Plan Administrator. Upon information and belief, in his capacity as Plan Administrator, Adams was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.     Defendant Richard Brown ("Brown") has served as EDS' Chairman of the Board and Chief Executive Officer at all relevant times. During the Class Period Brown made various statements regarding the Company's financial results and condition in EDS press releases. Upon information and belief, Brown was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     Defendant James E. Daley ("Daley") has served as EDS' President and Chief Financial Officer at all relevant times. During the Class Period, Daley signed the Company's Form 10-K filed with the SEC, attesting to the Company's financial condition. Upon information and belief, Daley was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22.     Defendant Jeffrey M. Heller ("Heller") served as EDS' President and Chief Operating Officer during Fiscal Year 1999. During Fiscal Year 2000, Heller served as EDS' Vice-Chairman and Director. During the Class Period, Heller signed the Company's Form 10-K filed with the SEC, attesting to the Company's financial condition. Upon information and belief,

Heller was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23. Defendant Michael Milton ("Milton") has served as EDS' Controller from Fiscal Year 2000 through present. Milton also signed EDS's Form 11-K, filed with the SEC, representing that he was the Plan Administrator. Upon information and belief, in his capacity as Plan Administrator, Milton was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24. Unknown Fiduciary Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plan as members of the Plan's Investment Committee during the Class Period. Their identities are currently unknown to plaintiff. Once their identities are ascertained, plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between September 7, 1999 and September 24, 2002 (the "Class Period").

Excluded from the Class are the defendants, any entity in which the defendants have a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors,

employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the defendants.

26.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.

27.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants each owed a fiduciary duty to plaintiff and members of the Class;

(b)    whether defendants breached their fiduciary duties to plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)    whether defendants violated ERISA; and

(d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

28.     Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

29.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

30.     A class action is superior to the other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

31.     Class action status is also warranted because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would: (i) establish incompatible standards of conduct for defendants, making class treatment appropriate pursuant to Rule 23(b)(1)(A); and (ii) as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests, making class treatment appropriate pursuant to Rule 23(b)(1)(B).

8

32.     There are one or more putative securities class actions pending against EDS and other defendants. The claims herein are under ERISA and related principles and are not being asserted by the plaintiffs in the securities class actions. The named plaintiffs in those class actions do not adequately represent the plaintiff or the Class herein with respect to ERISA claims and may be subject to defenses and limitations of liability under the Private Securities Litigation Reform Act, 15 U.S.C. § 74u-4 et seq., and other statutes or Rules that do not apply to the claims asserted herein.

33.     As required by ERISA, defendants carry insurance for claims asserted herein that may not be available to the defendants in the securities class actions.

34.     There are people in this Class who are not members of the classes or putative classes in the securities class action cases.

## DEFENDANTS' FIDUCIARY STATUS

35.     During the Class Period, upon information and belief, defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets, and had discretionary authority or responsibility for the administration of the Plan.

36.     During the Class Period, all of the defendants acted as fiduciaries of the Plan pursuant to section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section.

37.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1).

38.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, EDS chose to comply with the requirement of section 402(a)(1) by internalizing this fiduciary function.

39.     The Plan is administered by EDS Corporation, in part, through the Investment Committee. Upon information and belief, the Investment Committee was responsible for, *inter alia*, establishing investment objectives and policies related specifically to the EDS Stock Fund- one of the Plan's primary investment options. Since that committee did not have an independent juridical personality, however, the fiduciary role of these persons is attributed to their principal, EDS, on whose behalf they acted.

40.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under Section 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., performed fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I), provides that a person is a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets..." During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

10

41.     In addition, under ERISA, in various circumstances non-fiduciaries who knowingly participate in fiduciary breaches may themselves by liable.  To the extent any of the defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

42.     During the Class Period, and before, EDS's direct and indirect communications with Plan participants included material misrepresentations and omissions which caused plaintiff and members of the Class to purchase, and to hold and maintain investments in the EDS Stock Fund, and to accept at face value investments in the EDS Stock Fund.  These communications included but were not limited to SEC filings, annual reports and press releases.  EDS also acted as a fiduciary to the extent of this activity.

## SUBSTANTIVE ALLEGATIONS

### Dissemination of Materially False and Misleading Statements During the Class Period

43.     The business of EDS is dependant upon IT services, management, and consulting contracts.  The company described its business in its Annual Report for the year ended 2001 on its form 10-K filed with the SEC on March 6, 2002, on page 30:

> Electronic Data Systems Corporation is a professional services firm that offers its clients a portfolio of related services worldwide within the broad categories of traditional information technology ("IT") outsourcing, business process outsourcing, solutions consulting, management consulting, and product lifecycle management software and services.  Services include the management of computers, networks, information systems, information processing facilities, business operations and related personnel.

11

44.     The backbone of EDS's revenue stream– $16.2 billion out of EDS's total 2001 revenue of $21.5 billion or approximately 75 percent– is derived from its Information Solutions business.  Thus, the stability and predictability of such revenues over both the short and long term was a crucial material fact to EDS shareholders.

45.     EDS's 2000 Annual Report on Form 10-K filed with the SEC on March 16, 2001 described its contracts with clients as follows:

> Our fees are generally paid pursuant to contracts with our clients.  These contracts may provide for both fixed- and variable-fee arrangements.  The terms of our client contracts generally range from less than one year in the high- value consulting business to up to ten years in our IT outsourcing business.  Other than GM, no one client accounted for more than 10% of our total revenues in any of the past three years.  Approximately 42% of our 2000 revenues were generated outside the United States. (2000 10-K p. 5)

EDS's 2001 Annual Report on Form 10-K filed with the SEC on or about March 6, 2002 ("2001 10-K") provided a nearly identical description of the contracts under which EDS provides, inter alia, Information Solutions services:

> Our fees are generally paid pursuant to contracts with our clients.  These contracts may provide for both fixed and variable fee arrangements.  The terms of our client contracts generally range from less than one year in the high-value management consulting business to up to 10 years in our IT outsourcing business.  Other than GM, no one client accounted for more than 10 percent of our total revenues in any of the past three years.  Approximately 43 percent of our 2001 revenues were generated outside the United States. (2001 10-K p. 5)

46.     EDS's 2001 10-K further touted its customer contracts for IT outsourcing as follows:

> Since January 1, 1995, we have signed new service contracts having a total contract revenue value of $135 billion over their terms. (2001 10-K p. 20)

47.    EDS made the following statement in its 2001 10-K regarding recognition of

revenues under its service contracts:

> *Revenue recognitio*n. We provide services under time-and-material, unit-price, or fixed-
> rice contracts which generally extend up to 10 years. Under time-and-material and
> certain unit-price and fixed-price contracts under which costs are generally incurred in
> proportion with contracted billing schedules, revenue is recognized when the customer
> may be billed. Such method is expected to result in reasonably consistent profit margins
> over the contract term. For certain unit-price and fixed-price contracts, we follow the
> guidance contained in AICPA Statement of Position ("SOP") 81-1, *Accounting for*
> *Performance of Construction-Type and Certain Production-Type Contract*s. SOP 81-1
> requires the use of percentage-of-completion accounting for long-term contracts that
> contain enforceable rights regarding services to be provided and received by the
> contracting parties, consideration to be exchanged, and the manner and terms of
> settlement, assuming reasonably dependable estimates of revenue and expenses can be
> made. The percentage-of-completion methodology generally results in the recognition of
> reasonably consistent profit margins over the life of a contract. Amounts recognized in
> revenue are calculated using the percentage of services completed, on a current
> cumulative cost to total cost basis. Cumulative revenues recognized may be less or
> greater than cumulative costs and profits billed at any point in time during a contract's
> term. The resulting difference is recognized as unbilled or deferred revenue.
>
> Any estimation process, including that used in preparing contract accounting models,
> involves inherent risk. We reduce the inherent risk relating to revenue and cost estimates
> in percentage-of-completion models through corporate policy, approval and monitoring
> processes. Risks relating to service delivery, usage, productivity and other factors are
> considered in the estimation process. If sufficient risk exists, a zero-profit methodology
> is applied to a specific client contract's percentage-of-completion model whereby the
> amount of revenue recognized is limited to the amount of costs incurred until such time
> as the risks have been partially or wholly mitigated through performance. This
> methodology is primarily used at the inception of our largest outsourcing contracts where
> the amount of profit to be recognized on a contract over its term is not yet determinable.
> Our estimates of revenues and expenses on client contracts change periodically in the
> normal course of business, occasionally due to modifications of our contractual
> arrangements. In addition, the implementation of cost saving initiatives and achievement
> of productivity gains generally (2001 10-K p. 22)

48.    The foregoing statements had the effect of leading analysts and investors to

believe that EDS's IT outsourcing business could be relied on as a steady revenue producer even

in tough economic times. As Ian McDonald wrote in The Wall Street Journal Online:

The company, founded by Ross Perot in 1962, until recently had seemed like a relatively safe way to invest in the reeling technology sector. With a vast backlog of long-term contracts, its earnings appeared to have rare stability. The company had weathered the downturn in the economy and corporate-tech spending better than most.

49.    EDS did nothing to dispel the idea that its revenues from its long-term IT

outsourcing contracts could be relied upon even in bad times. EDS did not disclose its true

vulnerability to drops in discretionary spending by customers, and indeed misleadingly implied

that such exposure was limited to an anticipated drop in discretionary spending by one of its

largest clients, General Motors:

> Revenues from GM decreased $297 million, or 9%, in 2001 primarily due to GM's decision to tighten discretionary spending due to the current state of the worldwide economy and the automotive marketplace. We expect GM to continue to focus on reductions in discretionary spending in early 2002, and we estimate our revenues from GM will decline in the low double-digits in early 2002 on a constant foreign currency basis and may continue to decline at this rate subject to GM's continued focus on discretionary spending. (2001 10-K p. 12)

50.    EDS likewise was content to portray its newly-acquired airline infrastructure

outsourcing assets as steady, stable and reliable. In July, 2001, EDS had acquired Sabre Inc.'s IT

outsourcing business along with a 10-year, $2.2 billion service contract to EDS to manage

Sabre's IT systems, including American Airlines and US Airways. Defendant Brown represented

on March 15, 2001, in a press release regarding the acquisition:

> This transaction is a substantial win for EDS shareholders... this is what EDS does best – managing this kind of business by operating it and leveraging it through our global technology infrastructure for maximum efficiency.

EDS continued to paint the Sabre business as steady:

> On July 2, 2001, we acquired the airline infrastructure outsourcing business and internal information technology ("IT") infrastructure assets of Sabre Holdings Corporation

("Sabre") for $676 million in cash. Sabre's airline infrastructure outsourcing business includes contracts with American Airlines, US Airways and other airline and transportation industry clients. The acquisition makes us the leading provider of global IT infrastructure services to the airline industry and expands our presence in strategic infrastructure outsourcing. (2001 10-K p. 11)

51.     At no time prior to August 2002 did EDS reveal that its airline infrastructure outsourcing assets were subject to a drastic decrease in value if U.S. Airways declared bankruptcy, although it was a well-known fact as of at latest October 2001 that U.S. Airways faced grave financial problems attributable in part to the closure of its hub airport, Reagan National Airport in Washington, D.C., for a prolonged period after the events of September 11, 2001.

52.     As late as July 2002 EDS continued to make favorable statements and projections regarding its business, giving no inkling that huge problems were in the offing. EDS's July 24, 2002 pre-announcing its 2Q 02 results if anything painted a rosy picture:

"EDS' business and financial fundamentals are sound," said Dick Brown, chairman and CEO. "We continued to gain market share and increase revenue despite the continued weak corporate spending environment and the impact of WorldCom."

* * * *

"We continue to make the difficult choices necessary to ensure our company remains financially strong, meets client needs and fulfills commitments to investors," Brown said.

53.     On August 11, 2002, US Airways announced filing for bankruptcy protection under Chapter 11 in order to facilitate the prompt completion of its restructuring initiatives. In the wake of the bankruptcy of US Airways, on August 12, 2002, EDS outlined its relationship

with US Airways disclosing a total balance sheet exposure of approximately $140 million. EDS

represented in a press release as follows:

> EDS and US Airways have been in discussions for some time concerning a restructuring
> of their agreement. EDS expects these discussions to continue post-bankruptcy. EDS also
> expects to continue to provide services to US Airways post-bankruptcy and to be paid for
> those services. EDS does not expect the restructuring of the IT services agreement, if any,
> **to be material to its results of operations or financial position.** [Emphasis supplied.]

54.     On September 18, 2002, seemingly out of left field, EDS shocked the market with

a drastic revision (in a press release) of its previous earnings estimate for 3Q 02:

> PLANO, Texas - EDS today announced, based on preliminary estimates, it expects
> revenues and earnings for its third quarter of 2002 to be lower than previous company
> guidance.
>
> Reflecting continuing softness in the information technology services sector, the company
> now expects to report total revenue of approximately $5.3-$5.5 billion, down 2-5 percent
> from the $5.6 billion reported a year ago. EDS had expected total revenue to increase 4-6
> percent in the quarter.
>
> As a result of lower revenues, increased new business pursuit costs and other factors
> outlined below, the company expects to report earnings per share of 12-15 cents for the
> quarter ending September 30, 2002. The company had previously estimated earnings per
> share of 74 cents a share for the third quarter.
>
> The lower than expected contract revenue growth is due to reduced discretionary
> spending on existing contracts as well as fewer new sales. These factors, combined with a
> decision to increase investment in sales pursuits and processes to leverage an increased
> business pipeline, accounted for approximately 25-28 cents of the lowered earnings per
> share estimate.
>
> Other factors accounting for the remainder of the lowered earnings estimate were:
>
> • Recognition of asset writedowns associated with the US Airways bankruptcy in
>   August;
>
> • Financial performance of certain contracts primarily in Europe; and

- Asset impairments resulting primarily from EDS' decision to exit the subscriptionfulfillment business.

These additional factors are expected to result in further reductions to earnings per share of 14, 14 and 8 cents, respectively. On the positive side, 2 cents of expenses the company anticipated as a result of the WorldCom bankruptcy are now not expected to occur in the third quarter.

"I am deeply disappointed with our results for the quarter. The unexpected severity of the global slowdown in corporate spending, especially in the past two months, far exceeded our expectations. This combined with the US Airways bankruptcy and the adverse financial performance of certain European contracts impacted our results," said Dick Brown, EDS Chairman and CEO. "We remain confident in EDS' and the sector's long-term outlook. We continue to strengthen our organization and sign significant new business."

55.     Investors and analysts alike were astounded by EDS's unexpected slashing of its profit outlook to a fifth of its previous forecast. On September 19, 2002, the day after the announcement, EDS's stock price plummeted over 50% to close at $17.20, wiping out some **$8 billion** in market value. That same day, rating agencies Fitch and Standard & Poor's rushed to downgrade their ratings on EDS's senior unsecured debt. Observed Marty Shagrin, an analyst with Victory Capital Management.

"Given the fact that not too long ago, from the company's commentary, everything was supposed to be OK, I don't think you can have a ton of confidence that everything's out there."

56.     Mr. Shagrin's comments proved prophetic. On September 25, 2002, The Wall Street Journal reported that EDS had had to borrow $225 million in commercial paper the week before in order to make good on its obligations under agreements giving rise to put-option and other obligations that ultimately obligated EDS to in effect buy back a total of 5.44 million shares of EDS stock at fixed prices averaging over $60.00 per share. The market reacted to the

17

revelation of EDS management's undisclosed speculation by driving EDS's share price to an intraday low of $10.09 on September 24, 2002.

## MISSTATEMENTS AND OMISSIONS OF MATERIAL FACTS

57.    Defendants' made misrepresentations and/or omissions of material fact, including:

- Failing to disclose that EDS's backbone revenue from its Information Solutions IT outsourcing business is highly susceptible to interruption due to terms in EDS's service contracts that enable EDS customers to unilaterally suspend discretionary spending on IT outsourcing;

- Affirmatively misrepresenting the predictability of EDS's future cash flows by touting the anticipated revenue that EDS would supposedly receive from its IT outsourcing service contracts with customers without disclosing that payments under such contracts were not guaranteed;

- Failing to disclose the risk that EDS's airline infrastructure outsourcing assets that it acquired in its acquisition of Sabre Holdings Corp. were subject to a drastic decrease in value if U.S. Airways declared bankruptcy; and,

- Failing to disclose that EDS faced significant potential threats to its liquidity if its share price fell because of put-option and other obligations that ultimately obligated EDS to in effect buy back a total of 5.44 million shares of EDS stock at fixed prices averaging over $60.00 per share

## CLAIMS FOR RELIEF

## COUNT I

## FAILURE TO PROVIDE COMPLETE AND ACCURATE INFORMATION TO PARTICIPANTS AND BENEFICIARIES

### (Breaches of fiduciary and co-fiduciary duties in violation of ERISA, 29 U.S.C. § 1104(a)(1)(A)-(D), 29 U.S.C. § 1105)

58.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

59.     At all relevant times, defendants were and acted as fiduciaries within the meaning

of ERISA 3(21)(A), 29 U.S.C. § 1002(21)(A).

60.     ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29

U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the
> participants and beneficiaries and —
>
> (H)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
>
> (A)     with the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of like character and with like
> aims;
>
> (B)     by diversifying the investments of the plan so as to minimize the risk of large
> losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (C)     in accordance with the documents and instruments governing the plan insofar as
> such documents and instruments are consistent with the provisions of this title and
> Title IV.

61.     Moreover, ERISA fiduciaries have a duty to speak truthfully, to not mislead

participants and to disclose truthful information on their own initiative when participants need

such information to exercise their rights under the plan.

62.     In a plan with various funds available for investment, this duty to inform and

disclose includes: (1) the duty to provide to plan participants material information of which the

fiduciary has or should have knowledge that is sufficient to advise the average plan participant of

the risks associated with investing in any particular fund; and (2) the duty to refrain from material

misrepresentations.

63. ERISA also imposes strict co-fiduciary duties on plan fiduciaries. ERISA § 405,

29 U.S.C. § 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (a) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (b) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (c) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

64. Defendants breached their fiduciary and co-fiduciary duties by failing to provide

participants and beneficiaries with complete and accurate information regarding EDS stock,

including, but not limited to, by failing to disclose accounting and other irregularities, which

artificially inflated the value of EDS stock, and misleading participants and beneficiaries

regarding the soundness of EDS stock, and the prudence of investing their retirement benefits in

EDS stock.

65. Defendants withheld and concealed material information from participants and

beneficiaries about EDS's earnings prospects and business condition, and, thus, the

appropriateness of investing in EDS Stock. These actions and failures to act caused participants

and beneficiaries of the Plan to continue to make and to maintain substantial investments in the

EDS Stock Fund in the Plan at a time when defendants knew or should have known that the Fund was not a prudent investment option.

66.     Each defendant knowingly participated in these fiduciary breaches of its co-fiduciaries, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA § 404(a), 29 U.S.C. §1104(a), and had knowledge of the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

67.     In addition to its liability as a fiduciary, defendant EDS has liability, to the extent it acted with respect to the Plans in a non-fiduciary capacity, as a knowing participant in the fiduciary breaches of the other defendants.  EDS was and is a party in interest to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14), because it was and is (a) a fiduciary of the Plan; (b) a person providing services to the Plan; (c) an employer with some employees covered by the Plan; and/or (d) a corporation fifty percent or more of which is owned directly or indirectly by persons described in subparagraphs (a), (b) or (c).  As such, EDS had a duty under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) to refrain from participating in any breaches of fiduciary duty with respect to the Plan where, as here, it had actual or constructive knowledge of such breaches.

68.     EDS knowingly participated in its own and the other Plan fiduciaries' breaches described above, with actual or constructive knowledge of those breaches, in violation of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

69.     But for these breaches of fiduciary and co-fiduciary duties, the Plan's assets would not have been invested in EDS stock, but rather would have been invested in the most profitable alternative investment available to the Plan.

70.     As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars.

71.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan, and indirectly to Plaintiff, and the Plan's other participants and beneficiaries, caused by defendants' breaches of their fiduciary, and co-fiduciary duties, as well as by their breaches of the duties imposed upon them as non-fiduciaries with actual or constructive knowledge of the conduct alleged herein.

## COUNT II

## FAILURE TO ENSURE THAT PLAN ASSETS WERE INVESTED PRUDENTLY

### (Breaches of fiduciary and co-fiduciary duties in violation of ERISA, 29 U.S.C. § 1104(a)(1)(A)-(D), 29 U.S.C. § 1105)

72.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

73.     At all relevant times, defendants were and acted as fiduciaries within the meaning of ERISA 3(21)(A), 29 U.S.C. § 1002(21)(A).

74.     At all relevant times, each defendant also was and acted as a co-fiduciary of the other defendants and the other Plan fiduciaries within the meaning of ERISA § 405, 29 U.S.C. § 1105.

75.     Under ERISA, fiduciaries are responsible for the prudence of plan investments unless plan participants and beneficiaries themselves exercised effective and informed control over their individual accounts.  ERISA § 404(c), 29 U.S.C. 1104(c).

76.     Plan participants and beneficiaries did not exercise such control in this case as defendants failed to provide them with complete and accurate information regarding EDS stock, and misled them regarding the appropriateness of EDS stock as a Plan asset.  Therefore, defendant remained responsible for ensuring that Plan assets were invested prudently, and are liable for losses that were incurred as a result of imprudent investments.

77.     During the Class Period, none of the defendants reasonably could have determined that EDS stock was a suitable and appropriate investment for the Plan.  However, upon information and belief, defendants managed, directed, and approved investment of Plan assets in EDS stock.  Thus, defendants breached their fiduciary and co-fiduciary duties by failing to ensure that Plan assets were invested prudently.

78.     EDS knowingly participated in its own and the other Plan fiduciaries' breaches described above, with actual or constructive knowledge of those breaches, in violation of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

79.     But for these breaches of fiduciary and co-fiduciary duties, the Plan's assets would not have been invested in EDS stock, but rather would have been invested in the most profitable alternative investment available to the Plan.

80.     As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars.

81.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan, and indirectly to plaintiff and the Plan's other participants and beneficiaries, caused by the defendants' breaches of their fiduciary, and co-fiduciary duties, as well as by their breaches of the duties imposed upon them as non-fiduciaries with actual or constructive knowledge of the conduct alleged herein.

## COUNT III

### FAILURE TO MONITOR THE PLAN'S FIDUCIARIES

**(Breaches of fiduciary and co-fiduciary duties in violation of ERISA, 29 U.S.C. §1104(a)(1)(A)-(D), 29 U.S.C. § 1105)**

82.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if set forth fully herein.

24

83.    At all relevant times, defendants were and acted as fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) with respect to the Plan to the extent that they were charged with, responsible for, and/or otherwise assumed, the duty of selecting, monitoring, and, when if necessary, removing other Plan fiduciaries, including but not limited to those persons specifically identified as Plan fiduciaries in Plan documents.

84.    A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment if suitable. Thus, in connection with its duty to monitor the Plan's other fiduciaries, defendants were responsible for monitoring the manner in which those fiduciaries were investing the Plan's assets within the fund options, as well as the investment of profit sharing contributions.

85.    As fiduciaries with knowledge that Plan assets were being invested in EDS stock by investing fiduciaries, defendants also had an affirmative duty to disclose to the investing fiduciaries such material facts about the financial condition of the Company that these defendants knew or should have known the investing fiduciaries needed in order to make sufficiently-informed decisions, based on accurate information, concerning those investments.

86.    At all relevant times, each defendant was, and acted as, a co-fiduciary of the other defendants and the other Plan fiduciaries within the meaning of ERISA § 405, 29 U.S.C. § 1105.

87.    Defendants breached the fiduciary and co-fiduciary duties they owed to plaintiff, and the other plan participants and beneficiaries by:

(a)     failing to adequately monitor the investing fiduciaries' investment of Plan assets;

(b)     failing to adequately monitor the Plan's other fiduciaries' implementation of the terms of the Plan, including but not limited to the investment of Plan assets;

(c)     failing to disclose to the investing fiduciaries material facts concerning the financial condition of EDS that they knew or should have known were material to loyal and prudent investment decisions concerning the use of EDS stock in the Plan and/or with respect to the implementation of the terms of the Plan;

(d)     failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plan's assets;

(e)     failing to conduct an independent investigation into, and continually to monitor the merits of investing Plan assets in EDS stock;

(f)     knowingly participating in the investing fiduciaries' breaches by knowingly accepting the benefits of those breaches, both personally and on behalf of the Company;

(g)     knowingly undertaking to conceal acts and omissions of those fiduciaries, knowing they constituted fiduciary breaches; and

(h)     failing to remedy those fiduciaries' breaches, while having knowledge of them.

88.     EDS knowingly participated in its own and the other Plan fiduciaries' breaches described above, with actual or constructive knowledge of those breaches, in violation of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

89.     But for those breaches of fiduciary and co-fiduciary duties, the Plan's assets would not have been invested in EDS stock, but rather would have been invested in the most profitable alternative investment available to the Plan.

90.     As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars.

91.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan, and indirectly to plaintiff, and the Plan's other participants and beneficiaries, caused by defendants' breaches of their fiduciary, and co-fiduciary duties, as well as by their breaches of the duties imposed upon them as non-fiduciaries with actual or constructive knowledge of the conduct alleged herein.

## COUNT IV

### FAILURE TO DISREGARD PLAN DIRECTIVES THAT DEFENDANTS KNEW OR SHOULD HAVE KNOWN WERE IMPRUDENT OR HARMFUL TO PLAN PARTICIPANTS AND BENEFICIARIES OR TO AVOID CONFLICTS OF INTEREST

### (Breaches of fiduciary and co-fiduciary duties in violation of ERISA, 29 U.S.C. § 1104(a)(1)(A)-(D), 29 U.S.C. § 1105)

92.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if set forth fully herein.

93.     At all relevant times, defendants were and acted as fiduciaries within the meaning of ERISA 3(21)(A), 29 U.S.C. § 1002(21)(A), and co-fiduciaries within the meaning of ERISA § 405, 29 U.S.C. § 1105.

94.     A fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result, or that would harm plan participants or beneficiaries. ERISA

§404(a)(1)(d), 29 U.S.C. §1104(a)(1)(D). To the contrary, a fiduciary's duty of loyalty and prudence requires it to provide plan participants and beneficiaries with truthful and accurate information, and to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result, or otherwise would harm plan participants or beneficiaries.

95. The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

96. Defendants breached the fiduciary duties and co-fiduciary duties they owed to plaintiff, and the other plan participants and beneficiaries by investing Plan assets in EDS stock or allowing such investment, based on Plan documents, or directions by investment or other fiduciaries.

97. During the Class Period, defendants knew or should have known that EDS stock was an imprudent investment, and that such investment would or was likely to harm plan participants and beneficiaries. Therefore, during the Class Period, defendants should have provided participants and beneficiaries with complete and accurate information about the appropriateness of EDS stock as a Plan investment, and also should have disregarded Plan documents, or directives to the extent they required investment of Plan assets in EDS stock.

98.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by continuing to offer company stock as a Plan investment option during the Class Period, failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in EDS stock, and the information provided to participants and beneficiaries concerning the stock, and by failing to take such steps as were necessary to ensure that the fiduciaries of the Plan did not have conflicts of interest.

99.    EDS knowingly participated in its own and the other Plan fiduciaries' breaches described above, with actual or constructive knowledge of those breaches, in violation of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

100.    But for these breaches of fiduciary and co-fiduciary duties, the Plan's assets would not have been invested in EDS stock, but rather would have been invested in the most profitable alternative investment available to the Plan.

101.    As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars.

102.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a). Defendants are liable to restore the losses to the Plan, and indirectly to plaintiff and the Plan's other participants and beneficiaries, caused by defendants' breaches of their fiduciary, and co-fiduciary duties, as well as by their breaches of the duties imposed upon them as non-fiduciaries with actual or constructive knowledge of the conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3) with respect to the Class to the extent necessary to effect the purposes of this suit;

B.    That the Court enter Judgment providing the following relief to Plaintiff, and the Class:

(i)    Joint and several liability against Defendants, requiring them to make the Plan whole for the losses incurred as a result of their violations of ERISA, pursuant to ERISA § 502(a)(2), 29 U.S.C. §1109(a);

(ii)    Injunctive relief enjoining Defendants from continuing to violate their fiduciary duties under ERISA and the Plan documents, pursuant to ERISA §§ 409(a) and 502(a)(2) & (3), 29 U.S.C. §§ 1109(a), and 1132(a)(2) & (3);

(iii)    Other Injunctive and equitable relief as appropriate to remedy the breaches alleged above, pursuant to ERISA §§ 409(a) and 502(a)(2) & (3), 29 U.S.C. §§ 1109(a), and 1132(a)(2) & (3);

(iv)    Reasonable attorneys' fees and costs incurred by Plaintiff and the Plan Class, pursuant to ERISA § 502(g), 29 U.S.C. 1132(g);

(v)    Interest on all Judgment amounts as provided by law; and

(vi)    Such other legal or equitable relief as may be just and proper.

30

Dated:                                    **WOLFE, CLARK, HENDERSON, TIDWELL**
                                          **& MCCOY, L.L.P.**

                                          *Joseph H. meltzer, attorney-in-charge*

                                          By: ~~Joseph W. Wolfe~~

                                          Joseph W. Wolfe *(with permission)*
                                          State Bar No. 21859000
                                          123 North Crockett Street, Suite 100
                                          Sherman, Texas  75090
                                          Tel: (903) 868-1933
                                          Fax: (903) 892-2397

                                          Richard S. Schiffrin
                                          Joseph H. Meltzer
                                          **SCHIFFRIN & BARROWAY, LLP**
                                          Three Bala Plaza East
                                          Suite 400
                                          Bala Cynwyd, Pennsylvania  19004
                                          Tel: (610) 667-7706
                                          Fax: (610) 667-7056