IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| IN RE ELECTRONIC DATA SYSTEMS CORP. "ERISA" LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 6:03-MD-1512<br>LEAD CASE 6:03-CV-126<br>("ERISA") |

## THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

For their Consolidated Class Action Complaint against Defendants (the "Complaint"), Plaintiffs allege as follows:

### I. NATURE OF ACTION

1. This is a civil enforcement action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.

2. This lawsuit is for breach of fiduciary duty concerning a 401(k) plan sponsored by the Electronic Data Systems Corporation ("EDS" or the "Company"). It is brought pursuant to ERISA, the federal statute that comprehensively regulates such plans. This lawsuit concerns the EDS 401(k) (the "Plan"), a retirement plan established as a benefit for EDS employees to permit tax-advantaged savings for retirement and other long-term goals. The Plan is a defined contribution plan covering eligible employees of the Company. An employee becomes eligible to participate in the Plan upon the commencement of service with the employer.

3. Plaintiffs are current and former EDS employees who are or were participants in and beneficiaries of the Plan. Defendants are EDS itself and various other persons and committees who were responsible for managing the Plan (the Plan's "fiduciaries").

4. As a substantive matter, Plaintiffs allege, among other things, that these fiduciaries breached their duties in various ways with respect to the Plan's holdings of Company stock. As a procedural matter, Plaintiffs seek to bring the lawsuit to recover

losses suffered by the Plan as a class action, that being one of the available procedural vehicles for a claim of this type. And, as a remedial matter, Plaintiffs seek, among other things, to have the breaching fiduciaries make good to the Plan the losses it suffered as a result of their breaches.

## II. JURISDICTION AND VENUE

3. **Subject Matter Jurisdiction.** This is a civil enforcement action brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over the ERISA component of this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). This Court also subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

4. **Personal Jurisdiction.** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Texas.

5. **Venue.** Venue is properly laid in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more of the Defendants may be found in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b) & (c) because some of the Defendants, including EDS itself, reside in this District, EDSs' principal executive offices are located in this District, and EDS systematically and continuously does business in this District.

## III. THE PLAN

### A. Nature and Purpose of the Plan.

4. The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). Until July 1, 1998, the Plan was known as the EDS Deferred Compensation Plan.

5. The Plan is a legal entity which can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action Plaintiffs, who are described below, seek to recover the losses suffered by the Plan at the Plan level.

6. EDS is the Plan's "sponsor," within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). ERISA requires that a plan be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The currently effective instrument for the Plan is the EDS 401(k) Plan (Sixth Amended and Restated Document, effective January 1, 2002), executed February 26, 2002 (the "Plan Document"). Also in effect during the Class Period, as defined and discussed below, were the Fourth Amended and Restated Document, effective January 1, 1997, and the Fifth Amended and Restated Document, effective January 1, 2001.

7. Except as otherwise noted herein, the Plan documents in effect from the commencement of the Class Period are functionally equivalent to the Plan Document presently in effect.

8. ERISA requires that the Plan Administrator provide a Summary Plan Description ("SPD") to Plan participants and beneficiaries, which shall contain basic

information about the plan, and "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." ERISA § 102(a), 29 U.S.C. § 1022(a).

9. The SPD believed to be presently in effect is the EDS U.S. Benefits Handbook, effective May 31, 2002 (designated by EDS as its SPD and as a supplement to the prospectuses for the Plan that have purportedly been registered by EDS under the Securities Act of 1933). Also in effect during the Class Period were the EDS U.S. Benefits Handbooks (undated, but believed to be in effect during 2000) and the EDS U.S. Benefits Handbook – 2001 Guide for Employees.

10. The Plan was described by EDS as "a key benefit offered to U.S. employees as part of the EDS Financial Security Program." Letter to EDS Employees. According to the SPD, "[a]s part of the EDS Financial Security Program, the EDS 401(k) Plan is designed to help you save – on a pretax basis – for the future." EDS U.S. Benefits Handbook, 2001 Guide for Employees, p. 96. In the same vein, according to an EDS prospectus:

> The purpose of the Plan is to provide Employees with a retirement savings program through which they may elect to defer a portion of their salaries which their Employer will contribute to the Trust . . . . Further, the Company intends to provide the Employees with an additional incentive and retirement security by providing a uniform and nondiscriminatory plan through which contributions may be accumulated and distributed to Participants or their beneficiaries . . . .

Plan Document at 1. See also, Prospectus, dated December 12, 2000, p. 3, which was provided to Plan participants and beneficiaries as page 133 of the 2001 SPD ("eligible employees of EDS with a retirement savings program through which they may elect to defer a portion of their pretax salary, which EDS will contribute to the Trust. EDS provides an employer-matching contribution on participant deferrals. The Plan was created to provide additional incentive and retirement security for eligible employees");

EDS *Time Flies* booklet (the EDS 401(k) Plan is designed to help you prepare for a more comfortable financial future. You contribute to the plan . . . and benefit from EDS matching contributions . . . which make the plan one of the most effective ways to save for your future.").

11. 401(k) plans, such as the Plan, are by their nature designed to further tax-advantaged retirement savings for employees. Indeed, ERISA, the statute regulating such plans, is, as its name states, designed to further "employee retirement income security."

12. ERISA also requires that the assets of a pension benefit plan "be held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). Here, at the commencement of the Class Period, the assets were held in a trust (the "Trust") created pursuant to a "Trust Agreement by and between Electronic Data Systems Corporation and Vanguard Fiduciary Trust Company," dated May 1, 1992. The Vanguard trust agreement was amended once, on April 1, 1996. On May 15, 2002, Plan fiduciaries entered into the "EDS Defined Contribution Plans Master Trust Agreement with State Street Bank and Trust Company," which remains in effect to this day and pursuant to which, State Street Bank and Trust Company ("State Street" or the "Trustee") is the Trustee for the Plan.

## B. The Operation of the Plan.

### 1. Plan Personnel.

4. As alleged above, EDS is the Plan Sponsor, the entity that created the Plan.

5. The Plan was not only created by EDS, but was also managed and administered by EDS and various EDS committees and individuals, all of whom are therefore, under ERISA, fiduciaries of the Plan. These EDS committees and individuals are Defendants in this action. Their precise identity, the basis for their fiduciary status, the scope of their fiduciary duties, the nature of those duties, and the manner in which they were breached are alleged in detail below.

6. The persons who participate in the Plan are its participants. The beneficiaries of the Plan are the persons named by participants and their beneficiaries. The Plaintiffs in this action are, as alleged below, participants of the Plan.

## 2. Participant Contributions.

4. Full and part-time eligible EDS employees may participate in the Plan "upon commencing the first Hour of Service" with the Company. Plan Document at 16. According to EDS, sixty-six percent of eligible employees participate in the Plan.

5. Under the Plan, participants are permitted to contribute a portion of their pay — in before and after tax payroll deductions — to the Plan, subject to various dollar and percentage limits set out in the Plan Document and the SPD.

6. Subject to Internal Revenue Service limitations, from the commencement of the Class Period and before, until May 30, 2002, Plan participants were permitted to contribute up to twenty percent of their pay to the Plan. Effective May 31, 2003, the maximum contribution increased to forty percent of a Plan participant's earnings. These contributions are tax favored, from the point of view of the participants, in various significant ways, including the following: (a) in most cases current contributions are not taxed to the participant; (b) earnings on contributions are also in most cases not taxed; and (c) when the funds are distributed to the participant, he or she will in most cases be in a lower marginal tax rate.

7. Under the terms of the Plan Document and the Trust Agreement, the contributions to the Plan by and on behalf of the participants are held in trust by the Trustee and invested by the Trustee in the investment options offered by the Plan.

8. Participants direct the investment of their contributions to various investment options available in the Plan. Most of the Plan investment options were diversified mutual funds. However, at all times relevant to this Complaint, the Plan also offered as an investment option the EDS Stock Fund (also known as the "EDS Company Stock

Fund" effective May 31, 2002"), which invests up to ninety-nine percent of its assets in EDS stock (also referred to as "Company Stock" or "Employer Stock"), "unless the Trustee or the independent fiduciary, if appointed and then acting, determines that the acquisition or holding of Employer Stock would possibly result in the imposition of an excise tax under the Code or result in a violation of ERISA Sections 406 or 407."

9. At all times relevant hereto, Company Stock was represented by Defendants as a suitable investment for the Plan, meaning necessarily a suitable investment for retirement savings. Indeed, participant investment in the Plan along with the Company matching contribution in the EDS Stock Fund, described herein, were described by EDS as "one of the best ways to save for retirement." Letter to EDS Employees.

**3.     Matching Contributions.**

4. The Plan Document and SPD also provide that EDS will match twenty-five percent of the first six percent of an employee's eligible earnings contributed to the Plan, by making contributions to the participant's accounts in the EDS Stock Fund. In addition to the regular match, EDS provides for a "true-up contribution," described in the SPD as follows:

> To ensure that all participants (who made contributions during the calendar year and are employed on December 31) get a full 25 percent match on their contributions (up to 6 percent of compensation) over the entire year, a "true-up" calculation will be performed after the end of the year. The true-up calculation determines your average deferral percentage for the entire year and may result in an additional contribution from EDS.

5. The entire EDS match is invested in the EDS Stock Fund. According to the SPD, the portion of the match automatically invested in the EDS Stock Fund must remain in the Fund and may not be transferred from the EDS Stock Fund for two years from the date the contribution is made (except for participants who have reached age 55 and have ten years of service).

6. According to EDS, the restriction on moving the match out of EDS stock "is intended to promote the ownership of EDS stock." To further this goal, the Plan documents equate the match with "getting an immediate 25 percent return on your investment!" Retirement Changes at EDS, p. 4. Similarly, Plan materials provided to participants advise them that

> When you invest in the plan, EDS also contributes money on your behalf. For every $1 you put in the plan, EDS adds another 25 cents. *That's free money.* Your $1 contribution suddenly becomes $1.25 in savings. EDS will match your contributions up to 6% of your pay. So your best bet is to contribute at least 6% of your pay and maximize the employer match. *Don't walk away from free money.*

EDS "Time Flies" booklet, p. 3.

## 4. Concentration in Company Stock.

4. According to the Form 11-K filed with the Securities and Exchange Commission ("SEC") on June 28, 2002, on behalf of the Plan, as of December 31, 2000 the Plan held over $533,816,698 worth of EDS stock in the EDS Stock Fund. This represented over 20.8 percent of the "fair value/contract value" – the measure used in reporting Plan performance in the 11-K – of total assets in the Plan at the time, and was by far the single largest Plan asset.

5. A substantial portion of this fund consists of non-participant directed funds, i.e., Company matching contributions that may not presently be transferred or reallocated to another Plan investment option. The 2001 and 2002 Forms 11-K summarize the non-participant information "about the net assets and significant components of the changes in net assets relating to the EDS Stock Fund" as follows:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Net assets - beginning of year | $ 135,367,573 | $ 84,347,172 | $ 62,845,523 |
| Changes in net assets: | | | |
| Contributions | 40,650,551 | 37,531,345 | 34,710,914 |
| Dividends | 1,383,820 | 1,036,865 | 728,048 |
| Net appreciation (depreciation) | (110,027,365) | 20,070,605 | (7,128,762) |
| Benefits paid to participants | (5,553,750) | (3,932,384) | (5,039,006) |
| Transfers to participant-directed investments | (908) | (3,686,030) | (1,769,545) |
| Net assets - end of year | $55,051,133 | $135,367,573 | $ 84,347,172 |
| | ========== | ========== | ========== |

## IV. PARTIES

**A.    Plaintiffs.**

5.    Plaintiff Jeffrey Smith is a resident of the State of Washington and was at relevant times a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

6.    Plaintiff Richard Mizell is a resident of the State of Alabama and was at all relevant times and is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

7.    Plaintiffs are authorized to bring this action by ERISA §§ 409(a) and 502(a)(2) & (3), 29 U.S.C. §§ 1109 & 1132(a)(2) & (3), which confer standing to bring breach of fiduciary duty claims on, among others, participants in an employee benefit plan.

## B. Defendants.

5. **EDS.** Defendant EDS is a Delaware corporation with its principal place of business located at 5400 Legacy Drive, Plano, Texas. According to its web site, www.eds.com, "EDS is the leading global services company, provides strategy, implementation, business transformation and operational solutions for clients managing the business and technology complexities of the digital economy. EDS brings together the world's best technologies to address critical client business imperatives. It helps clients eliminate boundaries, collaborate in new ways, establish their customers' trust and continuously seek improvement." The Company's portfolio of services is managed through four market-facing lines of business: (1) Operations Solutions; (2) Solutions Consulting; (3) A.T. Kearney (management consulting); and (4) Product Lifecycle Management (PLM) Solutions.

6. **Chief Executive Officer.** Defendant Richard H. Brown was at relevant times, until March 20, 2003, the Chief Executive Officer ("CEO") of EDS.

7. **The Board Committee Defendants.**

(a) Defendant EDS Compensation and Benefits Committee (the "Board Committee") is a subcommittee of the Company's Board of Directors authorized to carry out such duties as determined by the Board of Directors and set forth in the Plan Document and Trust Agreement. The Committee has broad fiduciary responsibilities, including but not limited to appointment and monitoring of the Benefits Administration Committee and the Investment Committee.

(b) Defendant William H. Gray, III, was, at times relevant to this complaint, a member of the Company's Board of Directors as well

as, throughout the Class Period, a member of the Company's Compensation and Benefits Committee.

(c) Defendant Ray J. Groves was, at times relevant to this complaint, a member of the Company's Board of Directors as well as, throughout the Class Period, a member of the Company's Compensation and Benefits Committee.

(d) Defendant C. Robert Kidder was, at times relevant to this complaint, a member of the Company's Board of Directors, as well as, throughout the Class Period, a member of the Company's Compensation and Benefits Committee.

(e) The parties identified in this paragraph are referred to as the "Board Committee Defendants."

5. **The Administration Committee or Administrator Defendants.**

(a) As described in more detail below, Defendant Benefits Administration Committee is charged with the administration of the Plan. The Administration Committee is to consist of at least three members, including a Chairman, each of whom shall be an employee of the Company and each of whom shall be appointed by the Compensation and Benefits Committee or its designee. According to the EDS Board of Directors Compensation and Benefits Committee Report No. 101, the members of the Benefits Administration Committee are "EDS senior leadership."

(b) Defendant David R. Nixon has been Chairman of the Benefits Administration Committee during the Class Period. Defendant Nixon was also Director, Pension Investments for EDS.

(c) Defendant Kimberly McMann has been the Vice Chairperson of the Benefits Administration Committee during the Class Period.

Defendant McMann was also the President, State Business for EDS.

(d)     Defendant Elaine Moore has been a member of the Benefits Administration Committee during the Class Period.

(e)     Defendant Carl Schwendiman has been a member of the Benefits Administration Committee during the Class Period. Defendant Schwendiman was also the Div. Vice President, Investments of EDS.

(f)     Defendant Layla Mocio has been a member of the Benefits Administration Committee during the Class Period.

(g)     Defendant Michael E. Paolucci has been a member of the Benefits Administration Committee during the Class Period.

(h)     Defendant Karina L. Pettengill has been a member of the Benefits Administration Committee during the Class Period.

(i)     Defendant Joy Chandler has been a member of the Benefits Administration Committee during the Class Period. Defendant Chandler was also the Manager, Human Resources/Portfolio & Business Services for EDS.

(j)     The parties identified in this paragraph are referred to as the "Administration Committee Defendants" and the "Administrator Defendants."

5. **The Investment Committee Defendants.**

(a)     As described in more detail below, Defendant Investment Committee is charged with establishing a formal, written investment and funding policy for the Plan and shall have the discretionary authority to manage, directly or indirectly, all investment of Plan assets. The Investment Committee is to consist

of at least three members, including a Chairman, each of whom shall be an EDS employee. According to the EDS Board of Directors Compensation and Benefits Committee Report No. 101, the members of the Benefits Administration Committee are "EDS senior leadership."

(b)     Defendant James E. Daley has been Chairman of the Investment Committee during the Class Period. Defendant Daley was also the Chief Financial Officer ("CFO") of EDS.

(c)     Defendant Scott J. Krenz has been Vice Chairman of the Investment Committee during the Class Period. Defendant Krenz was also the Tresurer of EDS.

(d)     Defendant H. Paulett Eberhart has been a member of the Investment Committee during the Class Period. Defendant Eberhart was also the Senior Vice President, Finance of EDS.

(e)     Defendant Carl J. Schwendiman has been a member of the Investment Committee during the Class Period. Defendant Schwendiman was also the Div. VP, Investments of EDS.

(f)     Defendant Myrna B. Vance has been a member of the Investment Committee during the Class Period. Defendant Vance was also the Vice President, Investor Relations of EDS.

(g)     The parties identified in this paragraph are referred to as the "Investment Committee Defendants."

# V. APPROPRIATENESS OF CLASS ACTION

6. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure in their representative capacity on behalf of themselves and a class (the "Class") of all persons similarly situated, defined as follows:

> All participants in the Plan and their beneficiaries, excluding the Defendants, for whose accounts the Plan made or maintained investments in EDS stock through the EDS Stock Fund between September 7, 1999 and October 9, 2002 (the "Class Period").

7. Plaintiffs meet the prerequisites to bring this action on behalf of the Class because:

*Numerosity.* As of May 3, 2002, according to EDS, the Plan had more than 61,000 participants. *Inside EDS* (May 3, 2003). The Class consists of thousands of individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.

*Commonality.* There are questions of law and fact common to the Class. Among the common questions of law and fact are:

    (a)    Whether Defendants were fiduciaries;

    (b)    Whether EDS, the Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by causing the Plan to offer the EDS Stock Fund as an investment option for the Plan at a time when they knew or should have known that EDS stock was not a prudent investment for the Plan;

    (c)    Whether EDS, the Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants breached their fiduciary obligations to the

participants and beneficiaries of the Plan by causing the EDS Stock Fund to make and maintain investments in EDS stock, when it was not prudent to do so;

(d)     Whether EDS and the Board Committee Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by failing prudently to monitor the Administrator Defendants and Investment Committee Defendants, so that the Plan and participants' interests were adequately protected and served;

(e)     Whether EDS, the Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants breached their fiduciary obligations to provide complete and accurate information concerning the Company's financial well-being and the appropriateness of Company Stock as a retirement investment;

(f)     Whether EDS, the Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants breached their duty to avoid conflicts of interest and promptly to resolve them when they occurred by continuing to allow Company Stock as a Plan investment and by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the prudence of the Plan's investments;

(g)     Whether the Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), enabled co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the breaches;

(h) Whether, as a result of the fiduciary breaches engaged in by the Defendants, the Plan and its participants and beneficiaries suffered losses;

(i) Whether EDS, directly or indirectly, singly or in concert with others, sold unregistered EDS stock to the Plan or to Plan participants for the same per-share price as registered and free-trading EDS stock;

(j) Whether any such sales of unregistered EDS stock were for less than adequate consideration and were therefore "prohibited transactions" under ERISA; and

(k) Whether Plaintiffs are entitled to injunctive relief concerning the contents of the SPD; and

*Typicality.* Plaintiffs' claims are typical of the claims of the Class. In fact, except for the amount of losses within a given participant's account, an amount that can be calculated from the electronic records of the Plan, Plaintiffs' claims are virtually identical to those of other participants.

*Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that are antagonistic to or in conflict with the interests of the Class as a whole, and Plaintiffs have engaged competent counsel, highly experienced in ERISA class actions concerning employer securities in 401(k) plans, as well as in securities and other class and complex litigation, to ensure protection of the interests of the Class as a whole.

6. **Rule 23(b) Requirements.** This action is maintainable as a class action pursuant to Rule 23(b) for the following independent reasons:

(a) Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, the prosecution of separate actions by individual members of the Class would create the risk of

inconsistent adjudications, which would establish incompatible standards of conduct for the Defendants with respect to their obligations under the Plans. Fed. R. Civ. P. 23(b)(1)(A).

(b)     The prosecution of separate actions by the members of the Class create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

(c)     The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

(d)     Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

## VI. STATUS AND SCOPE OF FIDUCIARY DUTIES

### A.    Named Fiduciaries.

7.   ERISA requires every plan to provide for one or more named fiduciaries, who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).   Instead of delegating fiduciary responsibility for the Plan to external service providers, as is permitted by ERISA, EDS chose instead to internalize the fiduciary function.

8.   In the Plan Document, acting as Plan Sponsor, EDS designated itself as a Named Fiduciary of the Plan.  Plan Document at 58.  EDS is therefore a fiduciary of the Plan.

9.   In the Plan Document, acting as Plan Sponsor, EDS also designated its Board of Directors as Named Fiduciaries of the Plan.  Plan Document at 58.  All members of the Company's Board of Directors, including the Board Committee Defendants, who are a subset of the Board of Directors, are therefore fiduciaries of the Plan.

10. Similarly, acting as Plan Sponsor, EDS designated the Investment Committee as a Named Fiduciary of the Plan.  Plan Document at 58.  The Investment Committee Defendants are therefore all fiduciaries of the Plan.

11. EDS, acting as Plan Sponsor, also designated the Administration Committee as a Named Fiduciary of the Plan.  Plan Document at 58.  The Benefits Administration Committee Defendants are therefore all fiduciaries of the Plan.

12. Only if a fiduciary function is effectively delegated pursuant to ERISA § 405(c), 29 U.S.C. § 1105(c), may a named fiduciary limit the scope of its fiduciary responsibility.  With respect to the fiduciary issues involved here, the Plan documents and other materials obtained by Plaintiffs to date do not indicate that, except to the extent identified herein, any such delegation occurred.

13. While the Company established the Investment Committee and the Benefits Administration Committee as subcommittees of the Board of Directors Compensation and Benefits Committee, this was merely in an improper and unsuccessful attempt "[t]o insulate EDS, the Board of Directors, the CBC and EDS executives and employees from liability exposure as much as possible." Compensation and Benefits Committee Subcommittee Reports for 2000 Executive Overview and Summary (July 25, 2000). These subcommittees reported to and were controlled by the Board of Directors and the Compensation and Benefits Committee, and do not relieve the other defendants from liability for the claims alleged herein.

## B. De Facto Fiduciaries.

7. ERISA treats as a fiduciary not only persons explicitly named as fiduciaries under section 402(a)(1), but persons who in fact act as fiduciaries. ERISA makes a person (including a juridical person such as EDS) a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

8. ERISA permits the fiduciary function to be shared among various individuals and entities. Moreover, the Plan Document allows any person or group of persons to serve in more than one fiduciary capacity with respect to the Plan and permits the allocation of certain fiduciary responsibilities among named fiduciaries if there is more than one. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know definitively which fiduciaries exercised which fiduciary functions. Based on the information available to Plaintiffs, the Defendants' fiduciary responsibility was at least partially allocated among EDS, the Board Committee Defendants, the CEO Defendant, the Administration Committee Defendants, and the Investment Committee Defendants.

9. Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, and, despite requests, only partial disclosure of Plan documents and other information has been provided, certain of Plaintiffs' allegations are by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will to the extent necessary and appropriate amend this Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

10. As the Plan Document, the SPD, and the Trust Agreement all make clear, during the Class Period, the Company, Board Committee, the CEO Defendant, Administrator Defendants, and the Investment Committee Defendants performed fiduciary functions under this standard, and for this reason also are fiduciaries of the Plan under ERISA even aside from their status as named fiduciaries in the Plan Document.

## C. EDS.

7. Under this standard, EDS's status as a de facto fiduciary derives principally from three functions.

8. First, appointing and removing other fiduciaries is itself a fiduciary function, and persons having this power of appointment and removal are de facto fiduciaries. As the relevant documents make clear, EDS had this power. For example, EDS, acting through the Board of Directors, may change who serves on the Administration and Investment Committees.

9. Second, employers also act in a *de facto* fiduciary capacity under ERISA when they disclose information about the character and prospects of the company for the purpose of affecting the employees' ERISA plan elections. As alleged in more detail below, during the Class Period, EDS's communications with Plan participants, including EDS's SEC filings expressly incorporated by reference into the SPDs provided to participants, induced the participants through the Plan to continue to invest in and maintain investments in the EDS Stock Fund in the Plan and to accept at face value investments in EDS stock with the employer match contributions. For this reason EDS also acted as, and hence was, a fiduciary under ERISA.

10. Third, EDS acted as fiduciary because EDS itself controlled all the fiduciary functions of the plan. Several factors make this clear. All the other Defendants, were in fact mere instrumentalities of EDS:

(a)     EDS acted through its Board of Directors, including the Board Committee. The Board of directors, a named fiduciary, was also an agent of EDS.

(b)     The Administration Committee, a named fiduciary and the designated Plan Administrator, was also an agent of EDS. The Administration Committee was populated by EDS's own employees. These people acted in the ordinary course and scope of their employment or agency with EDS. They were compensated by EDS, not the Plan. They acted for EDS just as any other employee or agent acts for EDS in carrying out his or her job. Ordinary principles of vicarious liability and *respondeat superior* impose on EDS responsibility for their actions. Not only were the Administration Committee appointees subject to removal at the pleasure of EDS, its Board and the Board Committee, but because they were employees of EDS or a related company, their careers, financial livelihoods and reputations depended on their ongoing positive relationship with the Company. As a result, the appointees were influenced or controlled by the Company's tacit or explicit direction with respect to the management, investment or disposition of Plan assets.

(c)     The Investment Committee, a named fiduciary, was also an agent of EDS. The Investment Committee was populated by EDS's own employees. These people acted solely in the ordinary course and scope of their employment or agency with EDS. They were compensated by EDS, not the Plan. They acted for EDS just as any other employee or agent acts for EDS in carrying out his or her job. Ordinary principles of vicarious liability and *respondeat*

*superior* impose on EDS responsibility for their actions. Not only were the Investment Committee appointees subject to removal at the pleasure of EDS, its Board and the Board Committee, but because they were employees of EDS or a related company, their careers, financial livelihoods and reputations depended on their ongoing positive relationship with the Company. As a result, the appointees were influenced or controlled by the Company's tacit or explicit direction with respect to the management, investment or disposition of Plan assets.

7. With respect to EDS's fiduciary status, EDS was in fact the ultimate decision-maker with respect to *all* fiduciary functions other than those effectively delegated to the Trustee. *All* of the management and administration of the Plan was carried out by EDS's directors, officers, employees, and agents in the ordinary course and scope of their employment. Although ERISA permits delegation to outside, independent fiduciaries, and although there are numerous persons and entities which serve as independent fiduciaries, EDS chose to exercise all the fiduciary functions itself.

8. EDS was thus responsible for *all* the fiduciary functions at issue here, including selection of investment options for the Plan, communications with participants, and the monitoring of other fiduciaries.

## D.    Board Committee Defendants.

7.    Pursuant to the Plan Document, the EDS Board of Directors, including the Board Committee Defendants, had the power to appoint all members of the Administration Committee, as well as the members of the Investment Committee. Appointment of fiduciaries is itself a fiduciary function and the Board Committee Defendants are therefore also fiduciaries of the Plan.

8.    In addition, the Board, including the Board Committee Defendants, had "continuing allocation of fiduciary responsibilities to those persons." Plan Document at 58. Specifically, the EDS Board, including Committee Defendants, had final review and authority over all fiduciary actions taken and decisions made by the Administration Committee Defendants.

9.    Thus, the Board Committee Defendants retained all fiduciary functions not specifically and effectively delegated.

## E.     Defendant Brown.

7. Pursuant to the charters establishing the Investment Committee and the Benefits Administration Committee, Richard H. Brown ("Brown" or the "CEO Defendant"), as the Chief Executive Officer of EDS, had the power to appoint the chairpersons of the Administration and Investment committees, which chairpersons in turn appointed the rest of the members of the committees.

## F.     Administration Committee Defendants.

7. The Administration Committee is the Plan Administrator. The Administration Committee Defendants are thus charged with Plan administration and thereby exercise discretionary authority and control respecting management of the Plan and disposition of Plan assets, and possess discretionary authority and responsibility over administration of the Plan.

8. The Plan Document sets out the duties and authorities of the Administration Committee Defendants as follows:

> The Benefits Administration Committee is authorized to take such action as may be necessary to carry out the provisions and purposes of the Plan and shall have the authority to control and manage the operation and administration of the Plan. In order to effectuate the purposes of the Plan, the Benefits Administration Committee shall have the power to construe and interpret the Plan, to supply any omissions therein to reconcile and correct any errors or inconsistencies, to decide any questions in the administration and application of the Plan, and to make equitable adjustments for any mistakes or errors made in the administration of the Plan, and all such actions or determinations made by the Benefits Administration Committee, and the application of rules and regulations to a particular case or issue by the Benefits Administration Committee, in good faith, shall be final, binding and conclusive on all persons ever interested hereunder, subject, however, to review by the Compensation and Benefits Committee. The Benefits Administration Committee shall exercise such authority and responsibility as it deems appropriate to comply with the provisions of federal law and governmental regulations issued thereunder and to carry out any other duties delegated to the

Benefits Administration Committee in writing by the Compensation and Benefits Committee. The Benefits Administration Committee shall establish a written procedure to determine the qualified status of any domestic relations orders submitted to it for review and qualification as a Qualified Domestic Relations Order pursuant to Code Section 414(p) and ERISA Section 206. To comply with every order so determined to be Qualified Domestic Relations Order, the Benefits Administration Committee shall establish and maintain records reflecting the interest or interests of any person or persons for whose benefit amounts are held hereunder pursuant to a Qualified Domestic Relations Order. The Benefits Administration Committee shall be the designated agent for service of legal process.

Plan Document at 56-57.

9. These administrative duties are classic fiduciary functions. Thus, the Administration Committee Defendants performed fiduciary duties under the standards of ERISA § 402(a)(1), and for this reason are fiduciaries of the Plan under ERISA even aside from their status as named fiduciaries in the Plan Document.

10. The Administration Committee Defendants were appointed by EDS and the Board Committee Defendants to administer the Plan, which they did, within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), throughout the Class Period. As Plan Administrator, the Administration Committee Defendants or their designees manage day-to-day Plan operations. The Plan Administrator has the authority to make rules and regulations for the Plan, interpret its terms, and resolve appeals and disputes. The Administration Committee Defendants also participated in communications to Plan participants, including, for example, by signatures on the Forms 5500 (signed by Defendant Pettengill for years 1999 and 2000), the 2002 Form 11-K (certified pursuant to 18 U.S.C. § 1350 by Defendant Nixon) and in correspondence, newsletters and other communications as described below.

## G. Investment Committee Defendants.

7. The Investment Committee Defendants are charged with selection and monitoring of the investment alternatives offered under the Plan, and thereby exercise discretionary authority and control respecting management of the Plan and disposition of Plan assets, and possess discretionary authority and responsibility over administration of the Plan.

8. The Plan Document sets out the duties and authorities of the Investment Committee Defendants as follows:

> The Investment Committee shall establish a formal, written investment and funding policy and shall have the discretionary authority to manage, directly or indirectly, all investment of Plan assets. In establishing the investment and funding policy, the Investment Committee shall select the investment alternatives (the "Investment Funds") offered under the Plan, one of which shall be the EDS Stock Fund, and shall establish investment procedures for the investment of amounts with respect to which no investment direction is received pursuant to Section 8.2 (Direction of Investments). The selection of the Investment Funds shall be made in accordance with ERISA Section 404(c) and with the intent that the Plan operate as a section 404(c) plan. The Investment Committee shall have the authority to appoint an Investment Manager or Managers to manage, acquire and to dispose of any or all assets of the Plan. Further, the Investment Committee shall have the authority to appoint one or more Account Managers to oversee and direct the Trustee as to the investment of assets of the Plan not managed by Investment Managers. The Investment Committee shall appoint the Trustee in accordance with the provisions hereof. The Investment Committee shall identify appropriate investment objectives, and shall, subject to the right of each Participant to direct the investment of amounts allocated to his Individual Account, as implemented by the Plan Administrator, determine the proper apportionment of Plan assets among the various investment vehicles, and include said items in the investment policy of the Plan. The Investment Committee shall monitor and compare to others, or cause to be monitored and compared to others, the investments and investment performance of the Trustee, Investment Managers, and Account Managers, and shall make such reports and give such recommendations to the

> Compensation and Benefits Committee as it may request from
> time to time with respect thereto.

Plan Document at 57.

9. As summarized by EDS:

> the EDS Investment Committee, which has fiduciary responsibility
> for the investments offered in the EDS 401(k) Plan is required and
> authorized to select investment options for the Plan, monitor their
> performance and make changes when it determines that it is
> prudent and in the best interests of participants to do so.

YTR/YBR Questions & Answers: 401(k) Plan (May 10, 2003), p. 8.

10. These duties are classic fiduciary functions. Thus, the Investment Committee Defendants performed fiduciary duties under the standards of ERISA § 402(a)(1), and for this reason are fiduciaries of the Plan under ERISA even aside from their status as named fiduciaries in the Plan Document.

11. In addition to the other grounds for their fiduciary status, the Board Committee Defendants, the CEO Defendant, the Administration Committee Defendants and the Investment Committee Defendants also acted in a *de facto* fiduciary capacity under ERISA when, like EDS itself, they disclosed information about the character and prospects of the Company for the purpose of affecting the employees' ERISA Plan elections. As alleged in more detail below, during the Class Period, their communications with Plan participants, including the SEC filings they verified and which were expressly incorporated by reference into the SPDs provided to participants, induced the participants through the Plan to continue to invest in and maintain investments in the EDS Stock Fund in the Plan and to accept at face value investments in EDS stock with the employer match contributions. For this reason also the Board Committee Defendants, the CEO Defendant, the Administration Committee Defendants and the Investment Committee Defendants acted as, and hence were, fiduciaries under ERISA.

## VII. NATURE OF THE FIDUCIARY DUTIES

8. ERISA imposes extensive duties on fiduciaries which they must discharge when acting within the scope of their fiduciary responsibilities, and in some cases even outside their own sphere of responsibility. ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on all fiduciaries, regardless of the scope of their responsibility, a duty of loyalty — that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." Likewise, section 404(a)(l)(B) also imposes on all fiduciaries a duty of prudence — that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

9. A plan fiduciary's duties of loyalty and prudence entail, for fiduciaries with responsibility for plan communications, a specific duty to disclose and inform. This duty entails: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. This duty to disclose and inform recognizes the disparity that may exist between the training and knowledge of the fiduciaries, on the one hand, and the participants and beneficiaries, on the other. In a plan with various funds available for investment, this duty to inform and disclose also includes: (a) the duty to impart to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average plan participant of the risks associated with

investing in any particular fund; and (b) the duty not to make material misrepresentations.

10. A fiduciary's duties of loyalty and prudence also entail, for fiduciaries with responsibility for plan investments, a specific duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the plan, including employer securities, to ensure that each investment is a suitable option for the plan.

11. The fiduciary duty of loyalty also entails, for all fiduciaries, a duty to avoid conflicts of interest and to resolve them promptly when they occur.

12. No fiduciary may avoid his fiduciary responsibilities by relying solely on the language of the Plan Document.

13. Under ERISA § 405, 29 U.S.C. § 1105, all fiduciaries are also liable as co-fiduciaries whenever they participate knowingly in, or knowingly undertake to conceal, the fiduciary breach of another, if their own fiduciary breach has enabled another fiduciary to commit a breach, or if they have knowledge of a breach by such other fiduciary, unless they make reasonable efforts under the circumstances to remedy the breach. This duty applies even if the breaching fiduciary has a different area of responsibility from the co-fiduciary. For example, a fiduciary with responsibility solely for communications is liable as a co-fiduciary if he has knowledge of a breach by a fiduciary with responsibility only for the selection of investment funds.

## VIII. DEFENDANTS' COMMUNICATIONS WITH PLAN PARTICIPANTS

9. Upon information and belief, Defendants — particularly Defendants EDS and Brown — regularly communicated with Plan participants about EDS's corporate performance, future financial and business prospects, and the attractiveness of EDS stock, the second largest asset in the Plan. During the Class Period, the Company fostered a positive attitude toward EDS as a Plan investment. Management touted strong Company performance and stock benefits. Participants continually heard positive news about EDS's growth, were led to believe that EDS stock was a good investment, and that the Plan was prudently managed.

10. Moreover, as described in more detail below, EDS repeatedly highlighted favorable operating results and other positive financial indicators and minimized risks, which were in fact materially incorrect and which, during the Class Period, rendered EDS stock an imprudent retirement investment option.

11. Additionally, Defendants assured Plan participants and beneficiaries that the investment options were prudent, with statements such as "[w]e review our benefits regularly and on a global basis, making these changes when necessary." *Retirement Changes at EDS*, p. 3. In fact, a number of investment options were reviewed, modified, added and deleted before and throughout the Class Period. *See* EDS "Time Flies" booklet. For example, four new funds were added to the Plan effective January 1, 1999, seventeen funds were adopted during 2002, and the Plan changed the underlying investment vehicle for the EDS Bond Market Index Fund effective August 12, 2002.

12. Defendants further encouraged Plan participants and beneficiaries to invest in the Plan — particularly the EDS Stock Fund — and touted the value of the Company Match, which was invested primarily in EDS Stock, with statements such as the following:

> • "to get the maximum match from EDS, you should consider contributing at least six percent of your pay to the 401(k) Plan."

Deferred Compensation and Retirement Questions and Answers (updated April 6, 1998), p. 3.

- "Many employers have 401(k) plans that require the employer match be invested in company stock. As with *PerformanceShare* and the EDS Stock Purchase Plan, owning EDS stock is the opportunity to make the business of EDS your business – to help share in the successes you help create. However, it is ultimately up to you to determine your personal investment risks." Deferred Compensation and Retirement Questions and Answers (updated April 6, 1998), p. 18.

- *"SmartMoney* analysts rated 92 separate 401(k) plans offered by corporate America. The new EDS 401(k) Plan was given the number 39 slot, far outpacing such notable competitors such as AT&T, IBM, Lucent, Ameritech, Sprint and SYSCO." *For Your Benefit* (Aug. 1998).

- The Company match "is our way of encouraging you to take advantage of a great benefit." Letter from EDS Retirement Plans to EDS employees (Summer 2001).

- "Where else are you going to find a deal like the EDS 401(k) Plan?" Letter from EDS Retirement Plans to EDS employees (Summer 2001).

- "[B]ecause you are a valued EDS employee, we want to boost your savings by providing you with an opportunity to build a more secure financial future." Letter from EDS Retirement Plans to EDS employees (Summer 2001).

- "While tax-deferred saving is a key element in any savings strategy, the real kicker with this plan is that EDS matches your contribution – 25 cents on the dollar, on up to 6 percent of your eligible compensation." *For Your Benefit* (Oct. 2001).

- "The EDS 401(k) Plan is loaded with features that can boost your savings and help you prepare for a secure financial future. Here's a look at some of the benefits: Instant return. For every dollar you contribute to the plan, up to 6% of your pay, EDS adds 25 cents." Preparing for Your Future (2001).

- "Company Match Makes the 401(k) Plan Even More Powerful . . . If you don't participate at the 6 percent level, you're leaving money on the table." Booklet entitled "Your New and Improved EDS 401(k) Plan."

9. EDS assured participants that their retirement funds were prudently invested, distinguishing itself from other 401(k) debacles, such as Enron. In response to the question "[w]hat steps is EDS taking to prevent the same thing that happened to Enron employees?" the Company responded:

> The only similarity to Enron is that we are planning to change recordkeepers. Aside from that, *there are few correlations.* However, as a result of the collapse of Enron, much new legislation is being proposed to help prevent similar occurrences from occurring in 401(k) plans in general. EDS has already voluntarily put many of these new processes in place. For example, we provided our plan participants with more than 5 weeks of advance notice (many employees actually received 7 weeks advanced notice); we have no restrictions for moving employee contributions out of the EDS Stock Fund and only a two-year restriction for employer-matching contributions; and EDS has requested that our senior leadership not sell any of their personal holdings of EDS stock during the transaction suspension period. *We are doing everything possible to ensure that our processes can be referenced as "best practice."*

YTR/YBR Questions & Answers: 401(k) Plan (May 10, 2003), p. 3 (emphasis added).

10. The single largest Plan investment, however, remained EDS Stock, a significant portion of which was subject to restrictions on transfer. Defendants should have known that such investment was imprudent, particularly in the context of a retirement savings.

## A.    Incorporation by Reference of Publicly Filed Information.

9.    Many of Defendants' statements, including EDS's filings with the SEC, were incorporated by reference into the SPD and other communications, which were provided to all Plan participants and beneficiaries.    The document distributed annually to all Participants entitled "U.S. Benefits Handbook" was the SPD for purposes of the Plan's compliance with ERISA § 102, 29 U.S.C. § 1022.    This SPD included a Plan Prospectus which was "Appendix A" of the SPD and which incorporated all of EDS's SEC filings into the SPD.    For example, the Plan Prospectus for 2002, included as a part of the SPD, stated:

> Where You Can Find More Information
>
> We file reports, proxy statements and other information with the Securities and Exchange Commission ("SEC").    Our SEC filings are available over the Internet at the SEC's Web site www.sec.gov. You may also read and copy any document we file at the SEC's public reference room in Washington, DC.    Please call the SEC at 1-800-SEC-0330 for further information on the public reference room.
>
> The SEC allows us to "incorporate by reference" the information we file with them, which means that we can disclose important information to you by referencing those documents.    The information incorporated by reference is an important part of this Prospectus, and information we file later with the SEC will automatically update and supersede this information.    We incorporate by reference the documents listed below *and any future filings made with the SEC until all the shares offered hereby have been sold* or we have filed with the SEC an amendment to the registration statement on Form S-8 relating to this offering which deregisters all securities then remaining unsold:
>
> - Annual Report on Form 10-K for the year ended December 31, 2001;
>
> - Quarterly Report on Form 10-Q for the quarter ended March 31, 2002; and

- The description of our common stock and preferred stock purchase rights contained in our Registration Statement on Form 8-A filed with the SEC on May 29, 1996.

You may request a copy of these filings at no cost, by writing or telephoning us at the following address:

EDS Investor Relations
Mailstop H1-2D-05
5400 Legacy Drive
Plano, TX 75024-3199
Telephone 972 605 8933

(emphasis added).

9. For additional information, Plan participants and beneficiaries are also referred to the Plan Administrator.

Similarly, certain Board Committee Defendants also signed EDS annual and quarterly reports (Forms 10-K and 10-Q), employee benefit plan registration statements (Form S-8), proxy statements (Form DEF 14A), and registration statements (Form S-3) all of which had the purpose of conveying material information about investing in the EDS Stock Fund.[1]

10.

These communications — the accuracy of which these Defendants verified by their signatures — directly concerned one of the most significant assets of the Plan, Company

---

[1] For example, Defendant Gray signed the following EDS SEC filings: Form 10-K (dated 3/12/03); Form 10-K (dated 3/06/02); Form S-8 (dated 10/23/01); Form S-8 (dated 7/25/02); Form S-8 (dated 7/25/02); Form S-1 (dated 6/06/01); Form 10-K (dated 3/16/01); Form S-8 (dated 11/13/00); Form S-8 (dated 8/10/00); Form 10-K (dated 3/15/00); Form S-8 (dated 10/29/99). Defendant Groves signed the following EDS SEC filings: Form 10-K (dated 3/12/03); Form S-8 (dated 2/07/03); Form S-8 (dated 11/18/02); Form S-8 (dated 11/18/02); Form S-8 (dated 11/18/02); Form 10-K (dated 3/06/02); Form S-8 (dated 10/23/01); Form S-8 (dated 7/25/01); Form S-8 (dated 7/25/01); Form S-8 (dated 7/25/01); Form S-3 (dated 6/06/01); Form 10-K (dated 3/16/01); Form S-8 (dated 11/13/00); Form S-8 (dated 8/10/00); Form 10-K (dated 3/15/00); Form S-8 (dated 10/29/99). Defendant Kidder signed the following EDS SEC filings: Form 10-K (dated 3/12/03); Form S-8 (dated 2/07/03); Form S-8 (dated 11/18/02); Form S-8 (dated 11/18/02); Form S-8 (dated 11/18/02); Form 10-K (dated 3/06/02); Form S-8 (dated 10/23/01); Form S-8 (dated 7/25/01); Form S-8 (dated 7/25/01); Form S-8 (dated 7/25/01); Form S-3 (dated 6/06/01); Form 10-K (dated 3/16/01); Form S-8 (dated 11/13/00); Form S-8 (dated 8/10/00); Form 10-K (dated 3/15/00); Form S-8 (dated 10/29/99).

Stock. These communications were inaccurate and incomplete and contributed to an inaccurate impression regarding the security and prudence of Plan investment in EDS stock. Not only did these filings fail to disclose the Company's ongoing financial problems, they also failed to disclose that investment in Company Stock was an imprudent retirement investment.

11. As a result of such communications, participants lacked sufficient information to make informed decisions regarding whether they should continue to direct the Plan to invest their retirement contributions in EDS stock or whether they should continue holding such stock in the Plan.

**B.     Plan and Company Performance Information Readily Available.**

9. Persons eligible to participate in the Plan, including participants, were provided with materials developed "[t]o help you better understand the plan and show you how you can use it to develop a long-term saving strategy." Letter to EDS employees.

10. Plan information is readily available by telephone or by computer, and EDS employees were encouraged to access their accounts from work.

11. Initially during the Class Period, Plan participants and beneficiaries could access customized retirement plan information from EDS's interactive voice response (IVR) system, as well as its "People Web site," at www.cio.eds.com, and its fax on demand service, "BENEFIT*line*."

12. In addition, "Participant Online" provided participants with up-to-date account information, including complete account access, and the ability to conduct certain transactions online, including payroll deferral changes. *For Your Benefit* (Nov. 1998).

13. EDS maintains a Company-wide intranet, located at http://infocentre. eds.com, through which Plan participants can access Company news and other information concerning EDS and the Plan.

14. For "quick access" to current Plan information, participants could visit the U.S. Benefits Web site. According to EDS,

> Everything you need to know about the features of the EDS 401(k) Plan is located in the U.S. Benefits Handbook or on the U.S. Benefits Web site at https://infocentre.eds.com/us/people/ benefits/security_401k.html.

*For Your Benefit* (Feb. 2001).

15. The Company intranet includes a column entitled "inside EDS" containing news and 401(k) information impacting EDS employees (e.g., stock market closure delaying 401(k) investments, details of 401(k) Plan suspension during change in recordkeeper, announcement of end of suspension period and lifting of trading halt for EDS insiders, downloadable information on a variety of topics "for the EDS 401(k) Plan").

16. The Company also emailed to participants its "For Your Benefit" newsletter, purportedly intended to keep employees informed about the many benefit plans offered as part of your total compensation at EDS." One newsletter advised participants of 401(k) Plan Workshops and encouraged attendance by stating:

> We all know how important it is to plan ahead for a secure financial future. But saving and investing for the future can be confusing — now more than ever. Where to Save? How much to save? Which funds to choose? And how to learn more and make changes?

> To help you learn more, EDS is offering Saving and Investing workshops on a trial basis.

17. Similarly, EDS described participants as "avid" users of the Vanguard Internet site (www.vanguard.com), through which participants could access up-to-date

balance, investment option and other Plan information. In fact, as of November 2000, the Plan reported that participants had logged 134,000 visits to the Vanguard site. *For Your Benefit* (Nov. 2000).

18. A publication named *MoneyWhys*, containing detailed information on a variety of investment topics, including a series of articles to help participants evaluate their savings plan, investment strategies, risk tolerance, tips on account access and management and related topics, was distributed to Plan participants and beneficiaries on a quarterly basis by EDS and the Plan trustee.

19. Information on Plan changes and other features was routinely distributed to participants through an EDS publication entitled *For Your Benefit*. These communications led Plan participants to believe that the EDS Stock Fund represented a prudent retirement investment by making statements such as "Free Money! — If you aren't contributing to the EDS 401(k) Plan, you might as well be turning away free money . . . . The EDS 401(k) Plan is a great way to save for your retirement. Don't leave your money sitting on the table." *See For Your Benefit* (Sept. 1999); *For Your Benefit* (Sept. 2000).

20. EDS's communications with Plan participants culminated during the Class Period with institution of the "Your Benefits Resources (YBR)" web site (accessible through pre-established links on the Company's intranet or through any computer with Internet access) and automated telephone system, to give Plan participants and beneficiaries 24-hour account access, 7 days a week. Described as "your best source for detailed, personalized information about the EDS 401(k) Plan," through YBR participants were able to:

- Enroll or take action quickly and easily.

- Check your EDS 401(k) Plan account balance.

- Monitor your EDS 401(k) Plan investment performance.

- Change your EDS 401(k) Plan contribution rate, investment choices and asset allocation.

- Find out how to make the most of the EDS 401(k) Plan.

- Learn how the EDS 401(k) Plan works.

- Choose or change your beneficiary(ies).

- Learn about the basics of savings and investing.

- Request a loan or withdrawal from your EDS 401(k) Plan account.

- And more!

Booklet entitled "Your New and Improved EDS 401(k) Plan."

9. Nevertheless, despite the availability of information, EDS reported that "[a]bout 60 percent of participants want additional information about the 401(k) Plan." *For Your Benefit* (Nov. 2000). Had Defendants provided additional information, including disclosure that EDS stock was not a prudent retirement investment, the Plan might not have sustained such large losses from investment in EDS stock.

10. As fiduciaries, the Defendants owed a duty to provide participants with complete and accurate information regarding the Plan's investment options, including the EDS Stock Fund. This duty was particularly apparent in this case as Defendants communicated directly with participants regarding EDS stock by, on information and belief, encouraging participants to contribute to the EDS Stock Fund and providing participants with Plan performance and investment advice, including regarding the purported risks and benefits of investing in EDS stock in the Plan.

11. Despite these duties, however, these Defendants failed to provide Plan participants with complete and accurate information regarding EDS stock, such that the participants could appreciate the true risks presented by investments in EDS stock and could make informed decisions regarding investments in the EDS stock in the Plan.

12. Employees never received any information from the Company or any other Plan fiduciary that indicated that the Company's stock was not a prudent investment for their Plan balances.

13. Rather, promotional statements were made by Defendants for the purpose of encouraging Plan participants to invest in EDS stock and discouraging participants from liquidating the amounts they had already invested in EDS stock.

14. Moreover Defendants and their designees knew or should have known certain basic facts about the characteristics and behavior of Plan participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

    (a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

    (b)    Out of loyalty, employees tend to invest in company stock;

    (c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

    (d)    Employees tend not to change their investment option allocations in the plan once made;

    (e)    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

    (f)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

    (g)    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

13. Following the split-off from GM, EDS's business faltered. In 1999, to address the shortcomings of the business, the EDS Board of Directors named Defendant Brown Chairman and CEO of the Company.

14. Brown set out to reorganize EDS and to refocus its business model. Under his direction, EDS was operationally reorganized into a small number of business lines. The largest by far was the "Information Solutions" business line, contributing $16.2 billion of reported revenue — seventy-five percent of the Company's total reported revenue — in fiscal 2001.

> The Information Solutions line of business carried on EDS's traditional IT outsourcing business.[2] CEO Brown sought to refocus the Company's business model on this outsourcing business. Thus, the Information Solutions business grew from seventy-one percent of revenue in 1999 to seventy-five percent in 2001. And, Brown sought to anchor this business line around so-called "mega-deals" — large (over $250 million) multi-year IT outsourcing contracts. These contracts frequently had terms of 8 – 10 years, and potential revenue streams running into the billions of dollars.

15.

---

[2]

As the Company's 2001 Form 10-K explained:

> Information Solutions, our largest line of business, encompasses our traditional IT outsourcing business. Information Solutions includes network and system operations, data management, applications development and maintenance, desktop management and field services, as well as Internet hosting and Web site management. Our capabilities help clients align IT and operations with business strategy while ensuring predictable performance and costs.

9.  Even though the Defendants should have known these facts, and even though they should have known of the high concentration of Plan funds in Company Stock, they did nothing to address the problem.

## IX.  FACTUAL BACKGROUND OF BREACHES OF FIDUCIARY DUTY

### A.     The Company.

10. EDS is a world-wide enterprise headquartered in Plano, Texas.  The Company described its business in its SEC Form 10-K for the year ended December 31, 2002, as follows:

> Electronic Data Systems Corporation ("EDS") has been a leader in the global information technology ("IT") services industry for over 40 years.  We provide the strategies, solutions, services and products to help our clients manage the business and technology complexities of the digital economy, bringing together the world's best technologies and processes to address our clients' critical business imperatives.
>
> EDS is a professional services firm that offers its clients a portfolio of related services worldwide within the broad categories of traditional information technology ("IT") outsourcing, business process outsourcing, solutions consulting, management consulting, and product lifecycle management software and services. Services include the design, construction and/or management of computer networks, information systems, information processing facilities and business processes.

11. EDS reported combined revenues of over $ 21.5 billion for fiscal 2002.  As of December 31, 2002, EDS employed over 137,000 people, with operations in 44 states and 40 foreign countries.

12. EDS was founded by H. Ross Perot in 1962.  The Company was acquired by General Motors ("GM") in 1984, and was split off from GM in 1996, becoming an independent, publicly-held Delaware corporation at that time.

As noted in EDS's annual filings on Form 10-K for fiscal 1999, 2000, and 2001, the Company's revenues were, in large part, governed by and dependent upon the terms of these large client contracts:

> Our fees are generally paid pursuant to contracts with our clients. These contracts may provide for both fixed and variable fee arrangements. The terms of our client contracts generally range from less than one year in the high-value consulting business to up to ten years in our IT outsourcing business. Other than GM, no one client accounted for more than 5% of our total revenues in any of the past three years. Approximately 42% of our 1999 revenues were generated outside the United States.

> (1999 Form 10-K, filed March 15, 2000).

> Our fees are generally paid pursuant to contracts with our clients. These contracts may provide for both fixed-and variable-fee arrangements. The terms of our client contracts generally range from less than one year in the high-value consulting business to up to ten years in our IT outsourcing business. Other than GM, no one client accounted for more than 10% of our total revenues in any of the past three years. Approximately 42% of our 2000 revenues were generated outside the United States.

> (2000 Form 10-K, filed March 16, 2001).

> Our fees are generally paid pursuant to contracts with our clients. These contracts may provide for both fixed and variable fee arrangements. The terms of our client contracts generally range from less than one year in the high-value management consulting business to up to 10 years in our IT outsourcing business. Other than GM, no one client accounted for more than 10 percent of our total revenues in any of the past three years.

> Approximately 43 percent of our 2001 revenues were generated outside the United States.

> . . .

> Since January 1, 1995, we have signed new service contracts having a total contract revenue value of $135 billion over their terms.

> . . .

Revenue recognition. We provide services under time-and-material, unit-price, or fixed-price contracts which generally extend up to 10 years. Under time-and-material and certain unit-price and fixed-price contracts under which costs are generally incurred in proportion with contracted billing schedules, revenue is recognized when the customer may be billed. Such method is expected to result in reasonably consistent profit margins over the contract term. For certain unit-price and fixed-price contracts, we follow the guidance contained in AICPA Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts. SOP 81-1 requires the use of percentage-of-completion accounting for long-term contracts that contain enforceable rights regarding services to be provided and received by the contracting parties, consideration to be exchanged, and the manner and terms of settlement, assuming reasonably dependable estimates of revenue and expenses can be made. The percentage-of-completion methodology generally results in the recognition of reasonably consistent profit margins over the life of a contract. Amounts recognized in revenue are calculated using the percentage of services completed, on a current cumulative cost to total cost basis. Cumulative revenues recognized may be less or greater than cumulative costs and profits billed at any point in time during a contract's term. The resulting difference is recognized as unbilled or deferred revenue. Any estimation process, including that used in preparing contract accounting models, involves inherent risk. We reduce the inherent risk relating to revenue and cost estimates in percentage-of-completion models through corporate policy, approval and monitoring processes. Risks relating to service delivery, usage, productivity and other factors are considered in the estimation process. If sufficient risk exists, a zero-profit methodology is applied to a specific client contract's percentage-of-completion model whereby the amount of revenue recognized is limited to the amount of costs incurred until such time as the risks have been partially or wholly mitigated through performance. This methodology is primarily used at the inception of our largest outsourcing contracts where the amount of profit to be recognized on a contract over its term is not yet determinable. Our estimates of revenues and expenses on client contracts change periodically in the normal course of business, occasionally due to modifications of our contractual arrangements. In addition, the implementation of cost saving initiatives and achievement of productivity gains generally.

(2001 Form 10-K, filed March 6, 2002).

16. In 2000 and 2001, under Brown's leadership, EDS announced a string of new outsourcing mega-deals, highlighted by the award to EDS of a huge contract by the Department of the Navy, valued by EDS at about $ 6.7 billion. In 2001, the Company stated that it had an $80 billion backlog of contracts.

17. EDS described its revenue recognition policy under its outsourcing contracts as follows:

> We provide services under time-and-material, unit-price, or fixed-price contracts which generally extend up to 10 years. Under time-and-material and certain unit-price and fixed-price contracts under which costs are generally incurred in proportion with contracted billing schedules, revenue is recognized when the customer may be billed. Such method is expected to result in reasonably consistent profit margins over the contract term. For certain unit-price and fixed-price contracts, we follow the guidance contained in AICPA Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts. SOP 81-1 requires the use of percentage-of-completion accounting for long-term contracts that contain enforceable rights regarding services to be provided and received by the contracting parties, consideration to be exchanged, and the manner and terms of settlement, assuming reasonably dependable estimates of revenue and expenses can be made. The percentage-of-completion methodology generally results in the recognition of reasonably consistent profit margins over the life of a contract. Amounts recognized in revenue are calculated using the percentage of services completed, on a current cumulative cost to total cost basis. Cumulative revenues recognized may be less or greater than cumulative costs and profits billed at any point in time during a contract's term. The resulting difference is recognized as unbilled or deferred revenue.
>
> Any estimation process, including that used in preparing contract accounting models, involves inherent risk. We reduce the inherent risk relating to revenue and cost estimates in percentage-of-completion models through corporate policy, approval and monitoring processes. Risks relating to service delivery, usage, productivity and other factors are considered in the estimation process. If sufficient risk exists, a zero-profit methodology is applied to a specific client contract's percentage-of-completion model whereby the amount of revenue recognized is limited to the

amount of costs incurred until such time as the risks have been partially or wholly mitigated through performance. This methodology is primarily used at the inception of our largest outsourcing contracts where the amount of profit to be recognized on a contract over its term is not yet determinable. Our estimates of revenues and expenses on client contracts change periodically in the normal course of business, occasionally due to modifications of our contractual arrangements. In addition, the implementation of cost saving initiatives and achievement productivity gains generally.

2001 Form 10-K.

During the Class Period, EDS — in particular CEO Brown — was very positive in numerous public statements regarding the Company's business prospects. In 2000–2001, and well into 2002, as other technology firms were battered and IT spending dipped dramatically worldwide, Brown and others at EDS continued to foster the notion that EDS was largely immune from the downturn because of its heavy emphasis and reliance upon its large, multi-year IT outsourcing contracts. Indeed, the Chairman's Message, dated February 18, 2002 and contained in the Company's 2001 Annual Report, boldly stated: "In 2002, we celebrate 40 years of strength, stability and success. *Our enterprise is the strongest it has ever been. The future for EDS has never looked brighter.*" *At about that same time in February 2002, Brown publicly projected 13% - 16% revenue growth in 2002, and explained his ebullient outlook by referring to the IT outsourcing contracts as "annuities."*[3]

**B.**

---

[3] Brown repeatedly referred to the IT contracts as "annuities." For example, he is reported to have said to securities analysts in February 2002: "What other company has . . . that annuity stream into the future."

Defendants Should Have Known that EDS Stock Was Not a Prudent Plan Investment.

10. Hidden beneath the patina of optimism emanating from EDS's top leadership, however, was a complex of significant and growing risks to EDS's business and, by extension, to the value of Fund shares. These risks, which individually and in combination rendered concentrated investment in the Fund imprudent, included undisclosed risks with respect to EDS's then-current IT outsourcing contracts, exposure to industries (such as the airline and telecommunications industries) that were under severe stress, and decelerating discretionary IT spending. Additional large-scale risks, including large bullish bets on EDS's own stock and certain revenue recognition issues, were present and should have been known to Defendants.

11. Far from being the safe, annuity-like deals as described by Brown and other defendants, EDS's large IT outsourcing contracts were, during the Class Period, subject to several material but undisclosed risks. Many of these contracts were subject to "benchmarking" provisions which, if triggered, could (and in several cases did) negatively affect the price and other terms from the perspective of EDS. In addition, there were significant performance risks — "milestones" to be met — written into most of the IT outsourcing contracts. These performance and pricing risks were exacerbated by the Company's use of percentage-of-completion accounting; any reduction in pricing or increase in cost with respect to an ongoing contract could be magnified as a result of the use of this accounting method.

12. In addition to the performance and pricing risks, many of the IT outsourcing contracts contained provisions permitting the clients to elect, under certain circumstances, to terminate the contracts early. Some clients used this leverage to renegotiate their outsourcing contracts in ways that were unfavorable to EDS. Additional risks were inherent in the very large government contracts undertaken by EDS, such as its much-heralded contract to create an intranet system for the Navy and Marine Corps. Moreover, these contracts, and other large contracts with the

British government, required huge up-front capital expenditures by EDS that ultimately impacted the Company's liquidity.[4]

13.

During the Class Period it also became apparent to the defendants that there were problems in connection with the pricing of a number of the Company's large IT outsourcing contracts. Ultimately, the Company came to depend upon customers requesting expensive "add-ons" to the contracts in order to obtain expected revenue growth and margins. When discretionary IT spending began to decelerate, and clients requested fewer add-ons, both revenues and margins suffered.

14. Adding to this matrix of risks was the Company's growing exposure to industries that were particularly stressed by the general economic downturn that began in 2000-2001. In July, 2001, for example, EDS dramatically increased its exposure to the airline industry by acquiring the IT outsourcing business of Sabre Holdings Corporation, along with a 10-year, $2.2 billion service contract to EDS to manage Sabre's IT systems, which included the IT business of American Airlines and US Airways. The Company described the acquisition, in its 2001 Form 10-K, as follows:

> On July 2, 2001, the Company acquired the airline infrastructure outsourcing business and internal IT infrastructure assets of Sabre Holdings Corporation ("Sabre") for $676 million in cash. Sabre's airline infrastructure outsourcing business includes contracts with American Airlines, US Airways and other airline and transportation industry clients. The acquisition makes the Company the leading provider of global IT infrastructure services to the airline industry and expands the Company's presence in strategic infrastructure outsourcing.

---

[4] The combined effect of the U.S. Navy contract and the British government contract was to reduce the Company's free cash flow by about $900 million in 2001, and by at least that amount in 2002. Moreover, in the first quarter of 2003, EDS was forced to recognize a $334 million cumulative loss associated with the Navy contract.

15. On August 11, 2002, U.S. Airways filed for bankruptcy. In response to the U.S. Airways bankruptcy filing, on August 12, 2002, EDS issued a press release, which stated in part:

> PLANO, Texas – EDS today outlined its relationship with US Airways in light of the airline's bankruptcy filing Sunday.
>
> EDS and US Airways are parties to a long-term agreement under which EDS provides IT services to US Airways. EDS acquired the contract as part of its acquisition of Sabre Inc.'s IT outsourcing business in July 2001.
>
> Under terms of the contract, EDS is paid approximately $200 million annually. At the time of US Airways' bankruptcy filing, EDS had outstanding approximately $70 million in invoiced work and work in progress. Including these assets, contract fixed assets and intangibles, the total balance sheet exposure is approximately $140 million. This amount includes approximately $25 million, net of taxes, related to aircraft leases which pre-dated the services contract.
>
> EDS and US Airways have been in discussions for some time concerning a restructuring of their agreement. EDS expects these discussions to continue post-bankruptcy. EDS also expects to continue to provide services to US Airways post-bankruptcy and to be paid for those services. EDS does not expect the restructuring of the IT services agreement, if any, to be material to its results of operations or financial position.

16. EDS had not previously disclosed that its airline infrastructure outsourcing assets were subject to a drastic decrease in value if one or more of its airline customers filed for bankruptcy.

17. EDS's undisclosed business problems were not limited to issues involving booked business. As the economic downturn worsened and discretionary new IT spending decelerated world-wide in 2000-2002, EDS experienced increasing difficulty booking new business, and found that the terms demanded by clients in connection with new business were less favorable to EDS than in the past.

18. EDS had systems in place by 2000-2001 to monitor its business performance on a near-real time basis. For example, CEO Brown instituted regular "performance calls" — monthly conference calls involving about 125 of the Company's top worldwide executives (including Brown and James Daly, then the CFO), during which the performance of the various business units was discussed in detail. Brown also instituted the "Service Excellence Dashboard." This was a web-based tool used to measure and track the performance of current contracts, such that the status of over ninety percent of EDS's accounts was displayed on the desktops of the Company's top executives. As a result of these and other systems, EDS executives, including Brown and the other Individual Defendants, should have known of the risk issues discussed above on a current basis.

19. Ultimately, on September 18, 2002, the Company issued the following press release, which was also filed with the SEC on September 18, 2002, in a Form 8-K:

> PLANO, Texas — EDS today announced, based on preliminary estimates, it expects revenues and earnings for its third quarter of 2002 to be lower than previous company guidance.
>
> Reflecting continuing softness in the information technology services sector, the company now expects to report total revenue of approximately $5.3-$5.5 billion, down 2-5 percent from the $5.6 billion reported a year ago. EDS had expected total revenue to increase 4-6 percent in the quarter.
>
> As a result of lower revenues, increased new business pursuit costs and other factors outlined below, the company expects to report earnings per share of 12-15 cents for the quarter ending September 30, 2002. The company had previously estimated earnings per share of 74 cents a share for the third quarter.
>
> The lower than expected contract revenue growth is due to reduced discretionary spending on existing contracts as well as fewer new sales. These factors, combined with a decision to increase investment in sales pursuits and processes to leverage an increased business pipeline, accounted for approximately 25-28 cents of the lowered earnings per share estimate.

Other factors accounting for the remainder of the lowered earnings estimate were:

Recognition of asset writedowns associated with the US Airways bankruptcy in August;

Financial performance of certain contracts primarily in Europe; and

Asset impairments resulting primarily from EDS' decision to exit the subscription fulfillment business.

These additional factors are expected to result in further reductions to earnings per share of 14, 14 and 8 cents, respectively.

\*       \*       \*

"I am deeply disappointed with our results for the quarter. The unexpected severity of the global slowdown in corporate spending, especially in the past two months, far exceeded our expectations. This combined with the US Airways bankruptcy and the adverse financial performance of certain European contracts impacted our results," said Dick Brown, EDS Chairman and CEO. "We remain confident in EDS' and the sector's long-term outlook. We continue to strengthen our organization and sign significant new business."

20. On September 19, 2002, EDS's stock price plummeted over fifty percent to close at $17.20, wiping out some $8 billion in market value, including significant Plan value for shares held by Plan participants and beneficiaries in the EDS Stock Fund.

21. Shortly thereafter, EDS disclosed that it had paid out $225 million as a result of losing bullish bets on its own stock. In an ill-fated attempt to ameliorate the cost of its stock option program, EDS entered into certain short put contracts. When its stock fell, EDS was forced to close out these contracts. EDS had not, prior to September 24, 2002, disclosed these financial obligations.

22. During the Class Period, Defendants failed to disclose that EDS's Information Solutions IT outsourcing revenue was highly susceptible to interruption due to terms in EDS's service contracts that enabled EDS customers to unilaterally suspend discretionary

spending on IT outsourcing, or the other risks relating to the IT outsourcing contracts discussed above.

23. Defendants failed to disclose the risk that EDS's airline infrastructure outsourcing assets that it acquired in the Sabre acquisition were subject to a drastic decrease in value if an airline, such as U S. Airways, declared bankruptcy.

24. As required by ERISA, Defendants issued Summary Plan Descriptions which, upon information and belief, expressly incorporated by reference during the Class Period all of the documents filed by EDS with the SEC under the federal securities laws. These filings were signed by EDS and were either signed by or approved by the Board Committee Defendants. These filings contained the materially false and misleading information concerning EDS's business described herein, which the Defendants should have known was false.

Through the SPDs that incorporated by reference materially misleading SEC filings, such as those identified in paragraph 115 above, Defendants, when engaged in the fiduciary function of communicating with Plan Participants, materially misled Plan Participants with respect to the merits of investment in EDS stock.[5]

25.

As fiduciaries, Defendants were responsible to monitor on an ongoing basis the prudence of the Plan's investments and investment alternatives. Had Defendants reasonably discharged these obligations, they would have discovered that continued investment in EDS stock and the continued offering of EDS stock as a Plan investment alternative were imprudent because of the volatility of EDS stock and the Company's vulnerability to circumstances such as the US Airways bankruptcy or other circumstances causing customers to interrupt or terminate their IT service contracts.

---

[5] In addition, during the Class Period, CEO Brown regularly (usually every other week) sent an email to all EDS employees; these emails discussed EDS's business and prospects, but did not adequately disclose the business risks set out above.

26. In the months since Defendant Brown was replaced as CEO by Michael Jordan, the Company has continued to struggle. Jordan was recently forced to concede that many of the problems now facing EDS were "self-inflicted." Among the challenges at this point are liquidity concerns (heightened by recent downgrades by S & P and Moody's, which triggered an obligation to prepay certain software subscription costs, using up $227 million of the Company's cash on hand), and continuing problems with the huge contract with the Navy. These and other concerns continue to create significant risk for the Company's stock. Under these circumstances, continued investment in EDS stock in the Plan was imprudent. Nevertheless, EDS and the other current Plan fiduciaries have taken few, if any, steps to ameliorate these risks. Plaintiffs will seek equitable relief as necessary to protect the Plan and its participants from these continuing risks.

## C.    Defendant Brown Suffered from Conflicts of Interest.

10. In addition to their fiduciary duties described in Section VI. above, the Board Committee Defendants are also responsible for setting the compensation scheme for EDS's executives, including Defendant Brown.  EDS's compensation philosophy is based on the premise that executives should receive compensation determined in large part by "EDS' performance and the individual's contribution to that performance." Consequently, "a significant portion of each executive's annual compensation [is] contingent upon the company's current performance as well as the individual executive's contribution to that performance."

11. Indeed, according to the Company's 2003 Proxy Statement, "[a] primary focus of EDS' compensation philosophy has been to encourage significant long-term stock ownership by executives, thereby further linking management and shareholder interests."  EDS's executives, including Defendant Brown, are required to own a significant amount of EDS stock.  EDS's compensation program provides executives, including Defendant Brown, with multiple vehicles with which to accumulate EDS stock.

12. In addition to a base salary of $1,500,000, in 2000, Defendant Brown received a bonus of $3,412,800 and other compensation valued at $468,160.  In 2001, Brown's compensation skyrocketed, with a bonus of $7,000,000, restricted stock awards valued at $27,677,500, and other compensation of $357,628.

13. Because his compensation was so closely tied to the price of EDS stock, Defendant Brown had a very strong incentive to have the Plan continually investing, each month, in EDS stock.  Elimination of the EDS stock as a Plan investment option, on the other hand, would have (1) potentially reduced demand for EDS stock in the open market; and (2) sent a negative signal to Wall Street analysts and large institutional investors concerning the true underlying value of EDS stock, both of which would have

negatively affected the price of EDS stock, resulting in lower compensation for the Defendants.

14. These conflicts of interest put Defendant Brown in the position of having to choose between his own interests as an executive and stockholder, and the interests of the Plan participants and beneficiaries, which ERISA dictates his obligation to prudently and loyally serve with an "eye single" to their interests. On information and belief, because of these conflicts of interest, Defendant Brown failed to act with an "eye single" to the interests of participants and beneficiaries when acting as a Plan fiduciary.

# X. BREACHES OF FIDUCIARY DUTY

**A. COUNT I**

### Failure to Manage Plan Assets Prudently

**(Breaches of fiduciary duties in violation of ERISA, 29 U.S.C. § 1104(a)(1)(A)-(D), 29 U.S.C. § 1105 by the EDS, The Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants)**

11. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

12. At all relevant times, as alleged above, EDS, The Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

13. As alleged above, EDS, The Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants were all responsible for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

14. Under ERISA, fiduciaries who exercise discretionary authority or control over management of the plan or disposition of plan assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. EDS, The Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants were responsible for ensuring that all investments in EDS stock in the Plan were prudent, and are liable for losses incurred as a result of such investments if they were imprudent.

15. A fiduciary must disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

16. EDS, The Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants should have known that EDS stock was not a suitable and appropriate investment for the Plan in light of EDS's inappropriate accounting and business practices. Nonetheless, during the Class Period, these fiduciaries continued to offer the EDS Stock Fund as an investment option for the Plan and to direct and approve the investment of the EDS Stock Fund in EDS stock, instead of cash or other investments. Similarly, during the Class Period, these fiduciaries continued to provide Company matching contributions in EDS stock, instead of in a prudent retirement investment. In so doing, these Defendants further breached their fiduciary duties. Moreover, during the Class Period, EDS, The Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in the EDS Stock Fund and the Company matching contribution in the form of EDS stock. In addition, given that such a high concentration of the assets of the Plan were concentrated in the stock of a single company, the Defendants in this Count were obliged to have in place some financial strategy to address the extreme volatility of single stock investments. All of them failed to implement any such strategy.

17. In this case, EDS specifically retained an outside consulting firm to review the manner in which the Plan's fiduciary obligations were met. By a report submitted in November, 1999, this outside consultant recommended that defendants review the prudence of concentrating Plan assets in EDS stock, and suggested alternatives to reduce this concentration. On information and belief, Defendants rejected this advice based at least in part on Defendants' perception of what would be in the best interests of EDS, not on what was best for the participants.

18. EDS, The Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants are also subject to co-fiduciary liability because, among other things, they knowingly participated in, or knowingly undertook to conceal the failure to prudently manage Plan assets in exercising their discretion with respect to offering Company Stock as an investment option in the Plan and providing the Company matching contributions in EDS stock, despite knowing that such failure was a breach; enabling EDS, the Board Committee Defendants, the CEO Defendant, the Administrator Defendants and the Investment Committee Defendants, to fail to prudently manage Plan assets in exercising discretion with respect to Plan investments, including the match as a result of their own fiduciary breaches, and by having knowledge of the failure to prudently manage the Plan assets, yet not making any effort to remedy the breach.

19. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

20. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## B.    COUNT II

**Failure to Monitor Appropriately the Administrator Defendants and the Investment Committee Defendants and Provide Them with Accurate Information**

**(Breaches of fiduciary duties in violation of ERISA, 29 U.S.C. § 1104(a)(1)(A)-(D), 29 U.S.C. § 1105, by EDS, the Board Committee Defendants and the CEO Defendant)**

11. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

12. At all relevant times, as alleged above, EDS, the Board Committee Defendants and the CEO Defendant were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

13. At all relevant times, as alleged above, the scope of the fiduciary responsibility of the EDS, the Board Committee Defendants and the CEO Defendant included the responsibility to monitor other fiduciaries.

14. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries, the Administrator Defendants and the Investment Committee Defendants. In this case, that meant that the monitoring fiduciaries, EDS, the Board Committee Defendants and the CEO Defendant had the duty to:

(a)    Ensure that the Administrator Defendants and the Investment Committee Defendants possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plans, and the behavior of Plan participants;

(b)    Ensure that the Administrator Defendants and the Investment Committee Defendants are knowledgeable about the operations of

the Plan, the goals of the Plans, and the behavior of Plan participants;

(c)     Ensure that the Administrator Defendants and the Investment Committee Defendants are provided with adequate financial resources to do their job;

(d)     Ensure that the Administrator Defendants and the Investment Committee Defendants have adequate information to do their job of overseeing the Plan investments;

(e)     Ensure that the Administrator Defendants and the Investment Committee Defendants have access to outside, impartial advisors when needed;

(f)     Ensure that the Administrator Defendants and the Investment Committee Defendants maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

(g)     Ensure that the Administrator Defendants and the Investment Committee Defendants report regularly to the monitoring fiduciaries.

11. The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

12. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries should have in order to prudently to manage the plan and the plan assets.

13. EDS, the Board Committee Defendants and the CEO Defendant breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company Stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund. EDS, the Board Committee Defendants and the CEO Defendant should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan to continue offering the EDS Stock Fund as a Plan investment, and continuing to invest the assets of the EDS Stock Fund in EDS stock, when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

14. In addition, as a result of its inappropriate practices, EDS, the Board Committee Defendants and the CEO Defendant, in connection with their monitoring and oversight duties, were required to disclose to the Administrator Defendants and the Investment Committee Defendants accurate information about the financial condition and practices of EDS that they should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

15. EDS, the Board Committee Defendants and the CEO Defendant are liable as co-fiduciaries because they knowingly participating in the fiduciary breaches by the Administrator Defendants and the Investment Committee Defendants; by enabling the breaches by the Administrator Defendants and the Investment Committee Defendants; and by having knowledge of the Administrator Defendants' and the Investment Committee Defendants' breaches, yet not making any effort to remedy the breaches.

16. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

17. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## C.     COUNT III

### Failure to Provide Complete and Accurate Information to Plan Participants and Beneficiaries

### (Breaches of fiduciary duties in violation of §§ 404 and 405 of ERISA, 29 U.S.C. § 1104 and 1105 by EDS, the Board Committee Defendants and the CEO Defendant)

11. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

12. At all relevant times, as alleged above, EDS, the Board Committee Defendants and the CEO Defendant were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).

13. At all relevant times, the scope of the fiduciary responsibility of EDS and the Board Committee Defendants included Plan communications.

14. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.

15. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options such that participants can make informed decisions with regard to investment

options available under the Plan. This duty applies to all Plan investment options, including investment in the EDS Stock Fund.

16. Because investment in the EDS Stock Fund was not diversified, and EDS, the Board Committee Defendants, the Administrator Defendants and the Investment Committee Defendants chose to invest the EDS Stock Fund overwhelmingly in EDS Stock, such investment carried with it an inherently high degree of risk. This inherent risk made these Defendants' duty to provide complete and accurate information particularly important with respect to the EDS Stock Fund.

17. Furthermore, the SPD, a mandatory plan communication, must be scrupulously even-handed in describing the various risks and benefits of the plan: "The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted." 29 C.F.R. § 2520.102-2(b).

18. Defendants were and continue to be obligated to provide Plan participants with adequate and accurate information regarding the risks associated with investment decisions made with respect to their Plan accounts. This included full and accurate information regarding the risks of EDS stock, including the risks of investing in stock of their employer (including the risk that a downturn in the employer's business could

adversely affect their compensation, benefits, and employment, as well as their retirement savings), the risk of concentration in investment in the stock of a single company, the concentration resulting from the investment of the match in Company Stock, the comparison of the risk profiles of the EDS Stock Fund and diversified mutual funds, and the comparison of the likelihood of achieving their retirement savings objectives through investment in EDS stock as compared with investment in diversified mutual funds. Further, Defendants were obligated to inform Plan participants and beneficiaries fully and accurately with respect to conflicts of interest under which Plan fiduciaries operated, and with respect to the absence of any non-EDS personnel from the committee charged with the duty to monitor the prudence of investment in EDS stock.

19. Defendants breaches were particularly egregious in that in a November, 1999, report from Defendants' independent consultant engaged to review Defendants' fiduciary performance, Defendants were warned that "it is the plan sponsor's responsibility to: . . . provide sufficient information to enable plan members to make investment decisions." Among its findings, Defendants' expert concluded that Defendants must disclose the significant risk associated with investing in the EDS Stock Fund that was caused by the correlation between investment risk and employment risk. In other words, if the Company experienced a significant downturn, participants could lose their jobs and their retirement savings simultaneously. Defendant's subsequent failure to disclose this risk to participants was a further failure to provide an adequate description of the risks associated with investing in the EDS Stock Fund.

20. EDS, the Board Committee Defendants and the CEO Defendant breached their duty to inform participants by failing to provide complete and accurate information regarding EDS stock, EDS's accounting and business improprieties, and the consequent artificial inflation of the value of the stock and, generally, by conveying inaccurate information regarding the soundness of EDS stock and the prudence of investing retirement contributions in the stock. In particular the SPD did not comply the

requirements alleged above. These failures were particularly devastating to the Plan and the participants, the EDS Stock Fund was the largest Plan asset and, thus, losses in this Fund had an enormous impact on participants' retirement assets.

21. Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding EDS stock, despite knowing of their breaches; by enabling such conduct as a result of their own failure to satisfy their fiduciary duties; and by having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet not making any effort to remedy the breaches.

22. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the EDS Stock Fund and were material to any reasonable participant's decision about whether or not to invest or maintain any part of their Plan assets in the EDS Stock Fund during the Class Period. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the deceptive statements, acts, and omissions of the Defendants in this Count.

23. Plaintiffs further contend that the Plan suffered a loss, and Plaintiffs and the other Class members suffered losses, by the above-described conduct of the Defendants in this Count during the Class Period because that conduct fundamentally deceived Plaintiffs and the other Class members about the prudence of making and maintaining investments in the EDS Stock Fund, and that, in making and maintaining investments in the EDS Stock Fund, Plaintiffs and the other Class members relied to their detriment

upon the materially deceptive statements, acts and omissions of the Defendants in this Count.

24. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

25. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**D. COUNT IV**

### Breach of Duty of Loyalty

### (Breaches of fiduciary duties in violation of §§ 404(a)(1)(A) and 405 of ERISA, 29 U.S.C. § 1104(a)(1)(A) and 1105 by all Defendants)

11. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

12. At all relevant times, as alleged above, Defendants were all fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).

13. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty — that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

14. The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

15. Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by continuing to allow Company Stock as a Plan

investment during the Class Period, by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in Company Stock and the information provided to participants and beneficiaries concerning it, and generally failing to take whatever steps were necessary to ensure that the Plan fiduciaries did not suffer from a conflict of interest, including notifying the Department of Labor about the information which made Employer Stock an unsuitable investment for the Plan.

16. Upon information and belief, Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in the EDS Stock Fund, and this Fund's investment in EDS stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made EDS stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plan's investment in Company Stock.

17. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

18. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count. Further, in light of the historical failure to avoid conflicts of interest, Defendants are obligated to appoint one or more independent fiduciaries to protect Plan participants and beneficiaries in the future.

## E.    COUNT V

### Breach of Fiduciary Duty – Prohibited Transactions

### (Violations of ERISA §§ 406 and 408(e); 29 U.S.C.A. §§ 1106 and 1108(e))

19. Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs.

20.    Plaintiffs allege in this claim that EDS sold unregistered EDS common stock to the Plan (and through the Plan to participants); that this unregistered stock was worth less on a per-share basis than registered, free-trading EDS common stock; that EDS sold, and the Plan (acting through its fiduciaries, defendants herein) purchased, this unregistered stock at market prices (*i.e.*, without any discount for lack of marketability); that in these transactions, the unregistered stock constituted less than "adequate consideration" as that term is used in ERISA §§ 3(18) and 408(e) [29 U.S.C. §§ 1002(18) and 1108(e)]; and that such purchases were, as a result, "prohibited transactions" under ERISA § 406 [29 U.S.C § 1106].

21. At the time it owned EDS, General Motors ("GM") filed a Registration Statement in August, 1990 covering 4,000,000 shares of GM Class E Stock to be issued in connection with the Plan.   The shares covered by this Registration Statement were subsequently adjusted to 8,000,000 as a result of a two-for-one stock split

22. GM filed a second Registration Statement in December 1995 covering an additional 2,000,000 shares of GM Class E Stock to be issued in connection with the Plan.

23. EDS split off from GM in June 1996.  At that time, shares of GM Class E Stock were cancelled and converted into shares of EDS common stock. The Registration Statements for the GM Class E Stock were amended to become Registration Statements of EDS with respect to the EDS common stock offered under the Plan.

24. EDS filed no new Registration Statement until November 18, 2002. On that date, EDS filed a Registration Statement covering 12 million shares of EDS common stock and an indeterminate number of Plan interests to be issued in connection with the Plan.

25. Between June, 1996 and November 18, 2002, EDS issued and sold to the Plan shares of EDS common stock that were not covered by a Registration Statement and not exempt from registration under the Securities Act of 1933. EDS and the other Plan fiduciaries knew or should have known of this situation and of these transactions.

26. The sale of an employer's stock to an ERISA retirement plan sponsored by that employer is a "prohibited transaction" as that term is used in ERISA § 406 [29 U.S.C. § 1106], unless the transaction comes within the exemption provided by ERISA § 408(e) [29 U.S.C. § 1108(e)], which requires among other things a showing that the transaction was for "adequate consideration" as that term is defined in ERISA § 3(18) [29 U.S.C. § 1002(18)].

27. Because these shares were unregistered and not subject to any exemption, there was no generally recognized market for them; they could not have legally been traded on or through a "national securities exchange" and there was no "offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest". *See*, 29 U.S.C. § 1002(18)(A).

28. This unregistered EDS common stock was worth less, on a per-share basis, than the market price of free-trading EDS common stock. In other words, the unregistered shares should have been sold by EDS and purchased by the Plan (if at all) only for an amount that reflected a significant discount to the then-prevailing market price for free-trading EDS shares. On information and belief, plaintiffs allege that the transactions involving this unregistered stock were at then-prevailing market prices, without discount, and that neither EDS or any other Plan fiduciary directly or indirectly acted to determine, in good faith, the value of this unregistered EDS common stock.

29. By reason of the foregoing, EDS and the other defendants engaged in "prohibited transactions" in violation of ERISA § 406.

30. The Plan suffered losses when it purchased such stock for market prices (thus receiving less than adequate consideration in the transactions). Such losses include, at least, the difference between the amount given for each share of unregistered stock and the discounted amount each such share was worth at the time of each such purchase. Plaintiffs seek to recover such losses on behalf of the Plan.

31. Effective December 20, 2002, EDS, the Plan and fiduciaries of the Plan entered into a Tolling and Standstill Agreement (the "Tolling Agreement") to provide a period of time during which the parties could investigate claims arising out of the issuance of unregistered stock. The Tolling Agreement provided for the tolling of all defenses based all or in part on the passage of time or on a conditioning of rights based on the time of assertion, knowledge or notice, including all statutes of limitations or repose, and time related equitable defenses including laches.

## E.     COUNT VI

### Breach of ERISA Against EDS As a Party in Interest

### (Violations of ERISA §§ 406 and 408(e); 29 U.S.C.A. §§ 1106 and 1108(e))

32. Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs.

33. In connection with the violations of ERISA alleged in the preceding claim based on prohibited transactions, EDS acted as a "party in interest" as well as a fiduciary. This claim seeks equitable remedies against EDS as the seller of the unregistered EDS shares – in other words, in its role as "party in interest" rather than in its fiduciary role.

34. EDS, as a party in interest, is liable under ERISA § 502(a)(3) in connection with the above-alleged violations of ERISA § 406. Plaintiffs seek appropriate equitable relief, including without limitation the imposition of a constructive trust with respect to the excess sales proceeds realized by EDS.

## XI. SECTION 404(c) DEFENSE INAPPLICABLE

12. The Plan suffered a loss, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plan were invested in EDS stock during the Class Period in violation of the Defendants' fiduciary duties. In most cases, participants had no control at all over the EDS stock contributed to the Plan as EDS's matching contributions. Even as to the participant contributions, the Defendants were responsible for the prudence of investments in the Plan during the Class Period unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it. Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure, the Defendants did exactly the opposite. As a consequence, participants in the Plan did not control the Plan's assets that were invested in EDS stock, and the Defendants remained entirely responsible for ensuring that such investments were and remained prudent. The Defendants' liability to Plaintiffs for relief stemming from imprudent Plan investments in EDS stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

13. Section 9.11 of the Plan, which attempts to shift fiduciary responsibility and investment control to Plan participants and beneficiaries, stating that "[a] Participant shall be a Named Fiduciary to the extent such Participant directs the investment of any portion of his Individual Account and as otherwise provided in the Plan and as set forth in, and limited by, the Trust Agreement," is ineffective, as the Plan participants and beneficiaries did not direct the any portion of their Plan investments.

## XII. REMEDY FOR BREACHES OF FIDUCIARY DUTIES

13. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under section 409, 29 U.S.C. § 1109. This includes both monetary and equitable relief. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

14. **Monetary Relief.** With respect to the calculation of the monetary losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

15. **Equitable Relief.** With respect to equitable relief, Plaintiffs are entitled to an injunction requiring the following: (i) elimination of the EDS stock fund as a Plan investment alternative, or, (ii) alternatively, (a) the appointment to the Investment Committee of one or more qualified persons unaffiliated with EDS to evaluate and monitor the prudence of the continued investment of Plan assets in the EDS stock fund and the continued offering of the EDS stock fund as a Plan investment alternative, with the authority to limit such investment or eliminate the EDS stock fund as a Plan investment alternative, as such independent fiduciaries deem appropriate; and (b) the preparation and distribution to Plan participants and beneficiaries of appropriate materials addressing fully and accurately the risks associated with investment in the EDS stock fund, including the risks discussed above.

16. Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: 1) a monetary payment from the Defendants to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as required by ERISA § 409(a), 29 U.S.C. § 1109(a); 2) injunctive and other appropriate equitable relief described in Paragraph 207 above, or otherwise to remedy the breaches alleged above, as provided by ERISA § 502(a)(2)&(3), 29 U.S.C. § 1132(a)(2)&(3); 3) reasonable attorney's fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and other applicable law; 4) taxable costs; and 5) interest on some or all of these amounts as provided by law.

### XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court

1. Certify this action as a class action pursuant to Fed. R. Civ. P. 23;

2. Declare that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan's participants and beneficiaries;

3. Issue an order compelling the Defendants to make good to the Plan all losses to the Plan resulting from these breaches, including lost return on investments that would have resulted from prudent and loyal investment of the Plan's assets;

4. Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

5. Order that the Defendants disgorge amounts by which they were unjustly enriched;

6. Order injunctive relief as described in Paragraph 207, and award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with

respect to the Plan and the appointment of independent fiduciaries to administer the Plan;

7. Enjoin Defendants, and each of them, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

8. Award relief based on prohibited transactions against the Defendants as fiduciaries, and against EDS as a party in interest;

9. Award Plaintiffs their attorneys' fees and costs; and

10. Award such other and further relief as the Court deems equitable and just.

Dated: October 26, 2004.

Respectfully submitted,

SUSMAN GODFREY, L.L.P.

**/s/  Barry C. Barnett**
Barry C. Barnett
State Bar No. 01778700
Jonathan Bridges
State Bar No. 24028835
901 Main Street, Suite 4100
Dallas, Texas  75202-3775
Telephone: (214) 754-1900
Facsimile: (214) 754-1933

KELLER ROHRBACK, L.L.P.
Lynn L. Sarko
Gary Gotto
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, Washington  98101-3052
Telephone: (206) 623-1900
Telephone: (602) 248-0088
Facsimile: (206) 623-3384
Facsimile: (602) 248-2822

SCHATZ & NOBEL
Robert A. Izard
Andrew M. Schatz
Wayne T. Boulton
330 Main Street
Hartford, Connecticut  06106
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

ABRAHAM & ASSOCIATES
Jeffrey S. Abraham
One Penn Plaza, Suite 1910
New York, New York 10119
Telephone: (212) 714-2444
Facsimile: (212) 279-3655

THE BASKIN LAW FIRM
James D. Baskin III
State Bar No. 01872050
300 West 6th Street, Suite 1950
Austin, Texas 78701
Telephone: (512) 381-6300
Facsimile: (512) 322-9280

POTTER MINTON, P.C.
Mike Jones
State Bar No. 10929400
E. Glenn Thames, Jr.
State Bar No. 00785097
110 North College, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

WHATLEY DRAKE, L.L.C.
Joe R. Whatley, Jr.
2323 2nd Avenue North
Birmingham, Alabama 35203
Telephone: (205) 328-9576
Facsimile: (205) 328-9669

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on the following counsel of record via CM/ECF and first-class mail, on this the 26th day of October, 2004.

Robert Rachal
Howard Shapiro
Suzanne Dickey
SHOOK, HARDY & BACON, L.L.P.
LL&E Tower
909 Poydras, Suite 1100
New Orleans, Louisiana 70112-4017

Jones Day
Patricia Villareal
Thomas R. Jackson
James Karen
2727 North Harwood Street
Dallas, Texas 75201-1515

Reid L. Ashinoff
SONNENSCHEN NATH & ROSENTHAL
24th Floor
1221 Avenue of the Americas
New York, New York 10020-1089

Pamela Baker
SONNENSCHEN NATH & ROSENTHAL
8000 Sears Tower
Chicago, Illinois 60606

Fletcher L. Yarbrough
Tim Gavin
Mike Birrer
Jane Makela
CARRINGTON, COLEMAN, SLOMAN
& BLUMENTHAL, L.L.P.
200 Crescent Court, Suite 1500
Dallas, Texas 75201

**/s/ Jonathan Bridges**
State Bar No. 01778700