# EXHIBIT

# 6

# EXPERT REPORT AND DECLARATION

## OF

## BRUCE D. RUUD

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | |
|---|---|
| IN RE ELECTRONIC DATA SYSTEMS CORP. "ERISA" LITIGATION | ) CASE NO. 6:03-MD-1512 ) LEAD CASE 6:03-CV-126 ) ("ERISA") |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) JUDGE LEONARD DAVIS ) JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION. ................................................................................. 1

II.     QUALIFICATIONS................................................................................ 2

        A.      Employment History....................................................................... 2

        B.      Education...................................................................................... 3

        C.      Professional Designations .............................................................4

        D.      Presentations................................................................................4

        E.      Independent Fiduciary Appointment .............................................4

        F.      Expert Witness Testimony ............................................................4

III.    BACKGROUND.................................................................................... 6

        A.      Benefit Plans Sponsored by EDS…………………………………….6

        B.      Plan Provisions……………………………………………………….7

IV.     DID THE DEFENDANT FIDUCIARIES FULFILL THEIR
        FIDUCIARY OBLIGATION TO THE PLAN PARTICIPANTS AND
        BENEFICIARIES. .................................................................................. 8

        A.      Legal Overview…………………………………………………………8

        B.      Plan Governance……………………………………………………….9

        C.      Cortex Review of Plan Governance…………………………………13

        D.      Prudent Fiduciary Process Followed by the Committees………….16

        E.      Appointment of Trustee and Investment Manager………………….19

        F.      Conclusion…………………………………………………………….23

V.      DID THE PLAN PROVIDE SUFFICIENT INFORMATION TO

        THE PARTICIPANTS. ......................................................................... 25

        A.      ERISA Section 404(c)………………………………………………..25

## TABLE OF CONTENTS (cont.)

**Page**

B. Investment Education.........................................................27

C. Information to the Participants about the EDS Stock Fund...........29

D. Participant Reaction to EDS Stock Decline on September 19.....31

E. Conclusion.........................................................................32

0041249/003/ 16951v01

I, Bruce D. Ruud, pursuant to 28 U.S.C. §1746, declare as follows:

## I.    INTRODUCTION.

1.    I have been retained by Defendants in *In re Electronic Data Systems Corporation (EDS), ERISA Litigation* and counsel Proskauer Rose LLP and Carrington, Coleman, Sloman & Blumenthal ("Counsel") for this case to provide an expert report regarding issues related to the EDS 401(k) Plan (Plan).  Counsel for Defendants have asked me to provide opinions regarding the following:

- Was the governance structure for the Plan consistent with sound fiduciary practices and follow prudent fiduciary processes?

- Did the Compensation and Benefits Committee follow prudent fiduciary processes in appointing and overseeing its appointments to the Investment Committee and the Benefits Administration Committee?

- Did the Investment Committee Defendants follow a prudent fiduciary process in selecting and monitoring the investment options offered by the Plan during September 7, 1999 to October 9, 2002 (the "class period")?

- Was it prudent for the Investment Committee Defendants to rely on the Investment Managers appointed to manage the Stock Fund?

- Were participants provided sufficient information to satisfy the requirements of Employee Retirement Income Security Act (ERISA) Regulations Section 404(c)?

The answer to these questions is yes.

1

## II.    QUALIFICATIONS.

### A.    Employment History

2.    I founded Bruce Ruud & Associates, LLC, an employee benefits consulting firm serving clients throughout the U.S., in 2001. (I attach a copy of my CV as Exhibit A).  The firm provides advice to fiduciaries and plan sponsors regarding their obligations under Title I of ERISA and expert opinion testimony in employee benefits litigation.    We specialize in performing fiduciary audits of employee benefit plans to determine compliance with ERISA and assisting fiduciaries manage their fiduciary liability.  To do this, we carefully examine the plan governance procedures and review plan documents such as committee minutes to determine if they are following a prudent fiduciary process. We also provide training to fiduciaries about their responsibilities, authority, and liability.  The firm is also a registered investment advisor and provides investment advice to plan fiduciaries about the selection and monitoring of the investment options in their 401(k) plans.

3.    I joined the Pension and Welfare Benefits Administration of the U.S. Department of Labor in 1977 as an Investigator in the New Orleans Area Office. I transferred to Dallas as the Deputy Area Director in August 1985 and became the Regional Director in 1991. I retired in 2001 to pursue interests in the private sector. The Dallas Region is responsible for civil enforcement of Title I of the Employee Retirement Income Security Act of 1974 and the criminal statutes in Texas, Louisiana, Arkansas, New Mexico, and Oklahoma with respect to employee benefit plans sponsored in the private sector.    There are approximately 90,000 plans

2

throughout this Region, which covers 12 million participants and contain over $300 billion in assets.

4.     During my tenure as the Regional Director, the Region recovered over $260 million for workers and their families.   In addition, 137 individuals were convicted or plead guilty for crimes they committed against employee benefit plans. Sentences ranged from probation to 235 months. I supervised between 5,000-6,000 investigations during this time and was personally involved in the settlement of each voluntary compliance case in the Region. I was the final decision-maker on whether a case was meritorious of litigation and the settlement terms for each complaint filed. I participated in the court-ordered mediation of all civil cases during my 16-year tenure in the Dallas Region. I was also responsible for outreach programs and liaison activities with the thirteen judicial districts in his region, state attorneys general, insurance commissioners, and Congressional staffs.

5.     From 1972 through 1977, I was a Revenue Agent for the Internal Revenue Service in Corpus Christi, Texas and New Orleans, Louisiana. From 1972 to 1975, I performed audits of individuals, partnerships, and corporations. In 1975 I joined the Employee Plans Division and reviewed employee benefit plans to insure compliance with ERISA. Prior to joining the IRS, I worked as a cost accountant for the Lower Colorado River Authority in Austin, Texas.

**B.     Education.**

6.     I received a Bachelor of Business Administration from the University of Texas at Austin in 1971.

3

## C.    Professional Designations

7.    My Professional Designations are as follows:

- Certified Employee Benefit Specialist (1980)

- Certified Financial Planner (1999)

- Chartered Mutual Fund Counselor (2000)

- Chartered Retirement Plans Specialist (2001)

## D.    Presentations

8.    I am a frequent speaker on issues regarding employee benefit plans to organizations such as the Dallas Bar Association, the Southwest Benefits Association, Certified Employee Benefit Specialists, the National Defined Contribution Council, the Society of Financial Service Professionals, the Certified Financial Planners and many others.

## E.    Independent Fiduciary Appointment

9.    I have served as an independent fiduciary in a matter involving the sale of employer securities to an ESOP pursuant to U.S. Department of Labor Prohibited Transaction Exemption 2003-39.

## F.    Expert Witness Testimony

10.    I have testified many times as an expert on employee benefit plan matters in Federal District Court as well as before the House Ways and Means Oversight Committee of the U.S. Congress regarding civil and criminal enforcement of employee benefit plans.  During the past ten years, I have testified as an expert witness in the following cases:

4

- U.S. v. John Herring, Martha Sewell, Southern Style Success, Inc., Golden Goose Enterprises, Inc., Goldco International, Ltd., Success Southern Style, LLC and Home Care Center, Inc. in the United States District Court of the Eastern District of Louisiana. This case involved the criminal embezzlement of plan funds

- U.S. v. Richard Allison Hammond in the United States District Court of the Southern District of Texas. This case involved criminal kickbacks received by a Teamsters representative.

- U.S. v. Lynn Mcdon Wells in the United States District Court of the Southern District of Texas. This case involved criminal kickbacks received by a Teamsters representative.

- U.S. v. Michael McCord and O.B. Haley in the United States District Court of Western District of Texas. This was a criminal case where the defendants used employer securities to embezzle employee benefit plan funds.

- John H. Litzler, as Chapter 7 Trustee for Ameritruck Distribution Corp, et. Al. v. Acordia National Inc.; Acordia of Virginia, Inc.; Acordia of West Virginia, Inc. This was a civil case involving the non-payment of health benefit claims. I was engaged on behalf of the bankruptcy trustee.

- Terrence M. Hanlon vs. Alfred J. Melillo, Individually, as Trustee of the Harold Schnair Sales Company, Inc. Profit Sharing Plan and Trust, and as Director of the Harold Schnair Sales Company Inc., Harold Schnair Sales Company, Harold Schnair Sales Company Inc. Profit Sharing Plan, Harold

5

Schnair Sales Company Inc. Profit Sharing Trust, RBC Dain Rauscher Inc., J. Everett Airington, Wake Financial Group, Inc. and Sharon M. Wake in the United States District Court, Northern District of Texas, Fort Worth Division . This was a civil case involving the imprudent investment of plan assets.

• Jerry R. Summers, George T Lenormand, Jeffrey D. Crites, Louise Van Rensburg and James E. Shambo, individually and on behalf of all others similarly situated vs. UAL Corporation ESOP Committee, Marty Torres, Barry Wilson, Doug Walsh, Ira Levy, Don Clements, Craig Musa and State Street Bank &Trust Company in the United States District Court for the Northern District of Illinois, Eastern Division. This was a civil case concerning whether the Defendants and State Street fulfilled their fiduciary obligations to the Plan participants and beneficiaries and whether it was prudent to continue to hold the UAL stock in the Plan until the Trustee started selling it.

## III.   BACKGROUND.

### A.   Benefit Plans Sponsored by EDS

11.    EDS sponsors eleven benefit programs for their employees. Eight of these plans are covered by the ERISA and three are not. Employees may participate in the following plans:

- EDS Health Benefit Plan
- EDS Long-Term Disability Plan

6

- EDS Employee Assistance Plan
- EDS Health Care Reimbursement Plan
- EDS Employee Life and Personal Accident Insurance Plan
- Business Travel Accident Plan
- EDS Retirement Plan
- EDS 401(k) Plan
- EDS Flexible Benefits (non-ERISA)
- EDS Dependent Care Plan (non-ERISA)
- EDS Stock Purchase Plan (non-ERISA)

**B.    Plan Provisions**

12.    The Plan was adopted by EDS effective July 1, 1983 and allows employees with one hour of service to participate. The Plan is a defined contribution plan that allocates the employee contributions, employer matching contributions and investment gains and losses to an individual account for each participant. Participants can contribute up to 40% of their salary to the Plan. EDS provides an employer match of 25% of the employee contribution up to 6% of an employee's annual salary. Participants are allowed to defer income tax on the amounts contributed and the investment earnings until they take a distribution, which normally occurs upon termination of employment, retirement, death or disability.

13.    Participants elect how to invest their employee contributions among, from the beginning of the class period until May 2002, thirteen investment options, from May 2002 forward seventeen investment options and a mutual fund brokerage

7

window. There are currently three balanced funds that contain both stock and bond
investments that are designated as a Conservative Portfolio, Moderate Portfolio and
Aggressive Portfolio. There are six core funds including the EDS Stock Fund ("Stock
Fund") and eight specialty funds. In addition, the Plan allows participants to use a
self-directed brokerage account, which allows them to invest in many other mutual
funds, but not individual stock and bonds.

14.     The Plan is what is known as an "eligible individual account plan"
under ERISA. Section 15.1 of the Plan document provides that, effective May 31,
2002, the Stock Fund will invest primarily in Employer Stock and it shall constitute an
Employee Stock Ownership Plan (ESOP) pursuant to Internal Revenue Code
Section 4975(e) (7) and Regulations Section 54.4975.11. The entire EDS employer
match goes into the Stock Fund. Participants are allowed to transfer the employer
match to other investment options two years after it is contributed on their behalf.
This is sooner than the Internal Revenue Code requirement of age 55 with ten years
of service. As of October 10, 2002, the Stock Fund held 11,312,283 shares or 2.4%
of the outstanding shares of EDS stock. Of that, approximately 86% was participant
directed monies and 24% was subject to the match restriction.

## IV.     DID THE DEFENDANT FIDUCIARIES FULFILL THEIR FIDUCIARY
## OBLIGATION TO THE PLAN PARTICIPANTS AND BENEFICIARIES?

### A.     Legal Overview

15.     Section 404 of ERISA provides that fiduciaries must act solely in the
interest of the participants and beneficiaries and for the exclusive purpose of
providing benefits or defraying reasonable expenses of administering the plan and

8

the fiduciaries must act " with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims". In other words, the Plan fiduciaries must act solely in the interest of the plan participants and must act as a prudent person would.

16. ERISA Section 402(b)(2) states that every employee benefit plan must describe any procedures under the plan for the allocation of responsibilities for the operation and administration of the plan.

**B. Plan Governance**

17. The appointment and the duties of the Benefits Administration Committee (BAC) and the Investment Committee (IC) are described in Sections 9.2, 9.3, 9.8 and 9.9 of the Plan document as follows:

> 9.2 Appointment of the Benefits Administration Committee. The administration of the Plan will be in the charge of the Benefits Administration Committee consisting of at least three (3) members, each of whom shall be an Employee of the Company and each of whom shall be appointed by the Compensation and Benefits Committee or its designee. The Benefits Administration Committee is the named Plan Administrator hereunder. Each member of the Benefits Administration Committee shall serve until such member's successor shall be appointed. A member may serve for more than one (1) term. The Compensation and Benefits Committee, or its designee, shall appoint one (1) of the Benefits Administration committee members as Chairperson, may remove a member of the Benefits Administration Committee with or without cause, and may appoint a secretary or such other officers as it deems necessary and appropriate, and may fill vacancies in the Benefits Administration committee, however caused. A member of the Benefits Administration Committee may resign by delivery of such member's written resignation to the Compensation and Benefits Committee or its designee and other members of the Benefits Administration committee and such resignation shall be effective at the earlier of its acceptance by the Benefits Administration Committee or upon the appointment of a successor.

9

9.3 <u>Appointment of the Investment Committee.</u>   The Compensation and Benefits Committee, or it designee, shall appoint an Investment Committee consisting of at least three (3) members, each of whom shall be an Employee of the Company. Each member of the Investment Committee shall serve until such member's successor shall be appointed. A member may serve for more that one (1) term. The Compensation and Benefits Committee, or its designee, shall appoint one (1) of the Investment Committee members as Chairman, may remove a member of the Investment committee with or without cause, may appoint a secretary or such other officers as it deems necessary and appropriate, and may fill vacancies in the Investment Committee, however caused. A member of the Investment Committee may resign by delivery of such member's written resignation to the compensation and Benefits Committee or its designee and other members of the Investment committee, and such resignation shall be effective at the earlier of its acceptance by the Investment Committee or upon the appointment of a successor.

9.8 <u>Duties and Authorities of the Benefits Administration Committee.</u> The Benefits Administration committee is authorized to take such action as may be necessary to carry out the provisions and purposes of the Plan and shall have the authority to control and manage the operation and administration of the Plan. In order to effectuate the purposes of the Plan, the Benefits Administration Committee shall have the power to construe and interpret the Plan, to supply any omissions therein to reconcile and correct any errors or inconsistencies, to decide any questions in the administration and application of the Plan, and to make equitable adjustments for any mistakes or errors made in the administration of the Plan, and all such actions or determinations made by the Benefits Administration Committee, and the application of rules and regulations to a particular case or issue by the Benefits Administration committee, in good faith, shall be final, binding and conclusive on all persons ever interested hereunder, subject, however, to review by the Compensation and Benefits Committee. The Benefits Administration Committee shall exercise such authority and responsibility, as it deems appropriate to comply with the provisions of federal law and governmental regulations issued thereunder and to carry out any other duties delegated to the Benefits Administration Committee in writing by the Compensation and Benefits Committee. The Benefits Administration Committee shall establish a written procedure to determine the qualified status of any domestic relations orders submitted to it for review and qualifications as a Qualified Domestic Relations Order pursuant to Code Section 414 (p) and ERISA Section 206. To comply with every order so determined to be Qualified Domestic Relations Order, the Benefits Administration Committee shall establish and maintain records reflecting the interest or interests of any

10

person or persons for whose benefit amounts are held hereunder pursuant to a Qualified Domestic Relations Order.   The Benefits Administration Committee shall be the designated agent for service of legal process.

9.9 <u>Duties and Authorities of the Investment Committee.</u>   The investment Committee shall establish a formal, written investment and funding policy and shall have the discretionary authority to manage, directly or indirectly, all investment of Plan assets.  In establishing the investment and funding policy, the Investment Committee shall select the investment alternatives (the "Investment Funds") offered under the Plan, *one of which shall be the EDS Stock Fund,* and shall establish investment procedures for the investment of amounts with respect to which no investment direction is received pursuant to Section 8.2 (Direction of Investments).  The selection of the Investment Funds shall be made in accordance with ERISA Section 404(c) and with the intent that the Plan operates as a section 404(c) plan.   *The Investment Committee shall have the authority to appoint an Investment Manager or Managers to manage, acquire and to dispose of any or all assets of the Plan.*  Further, the Investment Committee shall have the authority to appoint one or more Account Managers to oversee and direct the Trustee as to the investment of assets of the Plan not managed by Investment Managers.  The Investment committee shall appoint the Trustee in accordance with the provisions hereof.  The Investment Committee shall identify appropriate investment objectives, and shall, subject to the right of each Participant to direct the investment of amounts allocated to his Individual Account, as implemented by the Plan Administrator, determine the proper apportionment of Plan assets among the various investment vehicles, and include said items in the investment policy of the Plan. The Investment Committee shall monitor and compare to others, or cause to be monitored and compared to others, the investments and investment performance of the Trustee, Investment Managers, and Account Managers, and shall make such reports and give such recommendations to the compensation and Benefits committee as it may request from time to time with respect thereto. (Emphasis added)

The Plan has complied with ERISA Section 402(b)(2) as it has provided the requisite

procedures for the operation and administration of the Plan.

18.    The Compensation and Benefits Committee (CBC) receives their

charter from the EDS Board of Directors.  Their primary purpose is the assist the

11

Board in fulfilling their responsibility to oversee the establishment, administration, and

appropriate functioning of stock, compensation and benefit plans and related matters

for EDS and its controlled affiliates as well as compensation matters for executives,

officers and EDS directors. The CBC is made up of at least three directors, none of

whom shall be employees of EDS. The Plan allocates to the CBC the duty to appoint

the BAC and the IC, and the CBC received periodic reports from the BAC and IC.

Section 9.11 of the Plan provides (emphasis added):

> 9.11   Named Fiduciaries and Allocation of Responsibility.   ERISA
> requires that certain persons, who are deemed to be "fiduciaries", as
> defined in ERISA Section 3(21)(A), be designated as "Named
> Fiduciaries" in the Plan. The Board, the Company, the Employer, the
> Trustee, the Investment Committee, and the Benefits Administration
> Committee are designated as Named Fiduciaries. A Participant shall
> be Named Fiduciary to the extent such Participant directs the
> investment of any portion of his Individual Account and as otherwise
> provided in the Plan and as set forth in, and limited by, the Trust
> Agreement. Each Named Fiduciary shall have only the powers, duties
> and responsibilities specifically allocated to such Fiduciary pursuant to
> the terms of this Plan. *The Board and the Compensation and Benefits
> Committee shall not have any power or fiduciary responsibility
> hereunder other than the power to name persons who shall comprise
> the Investment Committee and the Benefits Administration Committee
> and continuing the allocation of fiduciary responsibilities to those
> persons.* Each Named Fiduciary may, by written instrument, allocate
> some or all of such Named Fiduciary's responsibilities to another
> fiduciary or designate another person to carry, out some or all of such
> Named Fiduciary's fiduciary responsibilities. No Named Fiduciary shall
> be liable for an act or omission of any person who is allocated a
> fiduciary responsibility or who is designated to carry out such
> responsibility in carrying out a fiduciary responsibility except to the
> extent that the Named Fiduciary did not act in accordance with the
> standard contained in subsection 9.12(b) (Action by Fiduciaries) hereof
> with respect to the allocation, designation or continuation thereof, or
> implementation or establishment of the allocation or designation
> procedures. Any person or group of persons may serve in more than
> one fiduciary capacity with respect to the Plan.

19.     Section 9.12(c) of the Plan provides:

12

9.12 Action by Fiduciaries. . . . (c) Each Fiduciary shall furnish or cause to be furnished to each other Fiduciary all information needed for the proper performance of such Fiduciary's duties. Each Fiduciary warrants that any directions given, information furnished or action taken by such Fiduciary shall be in accordance with the provisions of the Plan or the Trust Agreement, as the case may be, authorizing or providing for such direction, information or action.

My understanding is that Plaintiffs claim this section imposed a duty upon all plan fiduciaries to take responsibility for communications with plan participants. Responsibility for such communications is, however, assigned to the BAC under the Plan, and there is no indication that section 9.12 was designed to override that specific delegation. Plaintiffs apparently also claim that section 9.12 created a duty on the part of all plan fiduciaries to share material non-public information concerning EDS' business or financial information with each other. These provisions are common in Plans, as plan fiduciaries often need employment and similar information to administer the plan to process and handle benefits (e.g., date of hire, employment classification, salary, etc..) and, in my experience, that is what these provisions refer to. My understanding from my work at the DOL and in private practice is that the federal securities laws apply to ERISA fiduciaries; accordingly, "proper performance" of ERISA fiduciary duties has never been thought to include providing access to inside information under those laws.

## C. Cortex Review of Plan Governance

20. The IC retained Cortex Applied Research Inc. (Cortex) in late 1998 or early 1999 to perform a best-practice governance review of the EDS Retirement and 401(k) Plans to review the current governance organization and decision-making

13

process based on interviews and review of plan documents and records. Cortex was to prepare a report comparing the existing structure with best practices and would make a presentation communicating their results and recommendations. The estimated cost was $60,000 plus expenses.

21.     Cortex completed this review and prepared a report dated June 1999 which recommended a number of changes:

- Changes should be made to the IC and the EDS Director of Investment responsibilities
- Prepare and approve an Investment Philosophy
- Prepare and approve a Defined Contribution Philosophy
- Prepare and approve Investment Policies and 401(k) Policies
- Expand the scope of reporting and monitoring
- Develop a Fiduciary Education Policy
- Review the governance system periodically for continued appropriateness. [See EDS-E0003838-3842]

22.     In August 1999 the IC approved the expenditure of $150,000, primarily out of Retirement Plan funds, but with the addition of some EDS 401(k) funds, for Cortex to coordinate a series of meetings with the IC and other providers with the following agenda:

- Identification of the key investment issues for which the fiduciaries are responsible
- Education about the potential approaches to these issues

14

- Review of EDS's current approach to each issue and the beliefs implied by that approach

- Review of industry practice and current research on the topic

- Discussion of the recent changes at EDS

- Agreement on any appropriate changes in philosophy

[See EDS-E0004011-4012]

23.     On January 13, 2001, Cortex presented their findings and recommendation in an IC meeting that started at 9:00am and finished at 2:30pm. In addition to five IC members, the Secretary of the IC, three EDS Treasury analysts or specialists, the Director of Pension and Corporate Investments, and an attorney from EDS Legal Affairs also attended. The Cortex review covered Plan objectives, risk management, investment program design, participant communications and education, monitoring and oversight.     [See EDS-E0002550-2586].     Dr. Por, President of Cortex, concluded that though there were some minor inconsistencies in the beliefs and practices of the Plan, the Plan's strategies and procedures were prudent and generally consistent with current investment research findings and practices of other defined contribution plans.     During the presentation, the IC addressed a number of issues posed by Dr. Por, but two are directly related to the EDS Stock Fund. First, there were questions about whether the inclusion of the EDS Stock Fund in the Plan creates a portfolio diversification issue for the participants. The IC concluded that it did not because the participants are sufficiently advised by Trustee/Investment Manager Vanguard of the potential risks of investing in a single stock such as EDS in the communication materials given them and because the EDS

Stock Fund is consistent with Regulation interpretations issued by the U.S. Department of Labor and should not raise any legal concerns for the Plan. [See EDS-E0000723]. The second question was whether the payment of the employer match in EDS stock creates a portfolio diversification issue for the participants. The IC concluded that is did not create a diversification issue for a number of reasons. EDS chose to make the match in the form of EDS shares to increase participants' ownership stake in EDS and more closely align the interests of the participants with the EDS shareholders. [See EDS-E0000723]. The IC also felt that the Plan is a self-directed plan and participants are not required to invest their personal contributions in the EDS Stock Fund, and only have to wait two years to exercise their discretion over the matching contributions. Lastly, they felt the participants were furnished sufficient information via Vanguard communications.        [See EDS-E0000723]

24.    As a result of the Cortex study, the CBC implemented changes to the charters for the BAC and IC on July 24, 2001 and the EDS Board of Directors also implemented changes to the CBC charter as a result of the Cortex recommendations.

**D.    Prudent Fiduciary Process Followed by the Committees**

25.    The BAC, IC and CBC met on a regular basis and memorialized their meetings with minutes. I was furnished minutes for all three of these committees. Both the BAC and IC provided annual updates of their activities to the CBC.

16

26.     The BAC minutes reflect that the Committee spent considerable time and resources in determining the effectiveness of the Plan communication strategy. In fact, an independent study concerning participant views about the Plan and Vanguard was performed by Walker Information in August 2000 and reported to the BAC in September 2000. [See EDS-E0006324-6351] Based on this independent review, the BAC and EDS were able to design an investment and retirement education program that was communicated to the Plan participants. In December 2000 the BAC adopted an EDS Employee Benefit Plan Policy that made it clear the BAC must always act for the exclusive purpose of providing benefits and paying reasonable administrative costs for the Plan. In fact, the policy states, "The interests of other parties, including EDS, should not be taken into account when making fiduciary decisions concerning the Plan's assets." [See EDS-E0000283-285] In November 2001 the BAC reviewed the steps being taken to encourage participation in the Plan. The BAC was actively involved in the selection of Hewitt and State Street in 2002 and in making sure the Plan participants were kept informed about the suspension period required to switch over the record-keeping from Vanguard to Hewitt. I saw no evidence that the BAC ever acted on behalf of EDS rather than the Plan participants. Perhaps the best example of this is when the BAC and the IC retained outside counsel to represent the BAC regarding the EDS stock registration shortfall issue. After trying to resolve the issue with EDS, the BAC and IC referred the matter to the Plaintiff lawyers in this case and the issue was added to the lawsuit. Even still, the BAC and the IC retained independent counsel to monitor the lawsuit and make sure the interests of the participants were being protected.

17

27.     The IC received quarterly reviews of the investment options in the Plan, including the Stock Fund. The Stock Fund was compared to the S&P 500 Index for the Quarter, 1 Year and 5 Year periods. In addition, the percentage of the participant contribution allocated to the Stock Fund was also provided. The IC made periodic substitutions or replacement of funds during the 1999-2002 time frame and developed a new fund lineup starting in May 2002 when they Plan switched to Hewitt and State Street. As indicated above, the IC commissioned Cortex to perform a review of the Plan governance procedures. In late 2001 and early 2002, the IC also had due diligence performed on unbundling the Plan services as it existed with Vanguard and moving to a separate trustee and record-keeper configuration. Ultimately, the IC decided to move to this approach to save Plan expenses, as the Plan could invest in separate accounts that would have lower expense ratios than the existing retail mutual funds. Proposals were solicited from three vendors to perform the record-keeping function and ultimately, Hewitt was selected. Vanguard did not wish to be the Trustee if they were not the record-keeper and State Street was selected as the successor Trustee. The IC received frequent updates about the communication strategy for informing the participants about the conversion period required to transfer the record-keeping function from Vanguard to Hewitt in May 2002. Both the IC and the BAC were briefed by EDS legal staff about the Enron case in early 2002 and outside counsel made a presentation to both committees on June 25, 2002 regarding Fiduciary Responsibilities Under ERISA. In addition, EDS legal staff members specializing in ERISA matters attended most, if not all, IC and BAC meetings.

18

28.    The CBC received annual updates from the BAC and the IC regarding their activities.   The CBC reviewed the governance recommendations made by Cortex and implemented changes to the BAC and IC charters.  The CBC was briefed on February 6, 2002 about the Enron case and comparisons were furnished between the EDS Plan and the Enron 401(k).  For example, Enron held 62% in company stock, EDS held 20% and the typical 401(k) plan held 30%.  [See EDS-E0014642] The CBC was informed that EDS was undertaking an extensive investment education campaign to employees, providing easier access to plan information through the EDS Inforcentre, additional training was being provided to the Plan telephone support staff and EDS was monitoring legislation and what peer companies were doing with respect to their 401(k) plans.  [See EDS E-0014643]

**E.    Appointment of Trustee and Investment Manager**

29.    ERISA Section 402 (c) (2) & (3) allows fiduciaries to delegate responsibilities to others for advice and about any fiduciary responsibility, including investment management.  ERISA recognizes that fiduciaries may need to consult with professional advisors to obtain good advice and also to shift fiduciary responsibility to professional advisors and to those independent of the Plan sponsor. The BAC and IC have used this to appoint Trustees, Investment Managers, record-keepers and consultants.  Section 9.9 of the Plan document provides that the IC has the authority to appoint an investment manager in accordance with ERISA Section 3(38).  Section 3(38) defines an "Investment Manager" as the fiduciary who has the power to manage, acquire and dispose of any asset of a plan.

19

30.    Vanguard Fiduciary Trust (Vanguard) served as the Plan Trustee from May 1, 1991 until State Street Bank and Trust (State Street) replaced them on May 15, 2002. [See EDS-E0005238-5247, EDS-E0000734-746] Vanguard also served as the record-keeper for the Plan until Hewitt assumed those duties on May 31, 2002.

31.    Vanguard was appointed the Investment Manager for the Stock Fund on April 12, 1995 effective April 7, 1995 until replaced as Investment Manager by State Street effective May 15, 2002. [See EDS-E0039684-687, EDS-E0003071-3084] Vanguard acknowledged that it was a bank as defined in the Investment Advisers Act of 1940 and was serving as an investment manager pursuant to ERISA Section 3(38). As Investment Manager, Vanguard acknowledged that it was independent of EDS and a fiduciary under ERISA for management of the Stock Fund, subject to the terms of the 401(k) Plan and the Investment Management Agreement. Those terms provided that, subject to ERISA's fiduciary duties and the liquidity needs of the Stock Fund, the Stock Fund would be invested primarily in shares of EDS common stock (formerly GM Class E Stock). [See EDS-E0039687]. As Investment Manager for the Stock Fund, Vanguard never had any reason to consider overriding the Plan terms to sell off EDS' stock or prohibit further investment in the Stock Fund.

32.    State Street became Investment Manager for the Stock Fund effective May 15, 2002 and also acknowledged that it was a bank as defined in the Investment Advisers Act of 1940 and was serving as an investment manager pursuant to ERISA Section 3(38). [See EDS-E0003071-3084].   State Street also acknowledged that it

was serving as a fiduciary to the Plan and will comply with the prudent man, prohibited transaction and other requirements of ERISA.   The Investment Management Agreement gives State Street the complete and exclusive discretion in the investment and reinvestment of the Stock Fund in EDS stock and in the State Street Short Term Investment Fund.   Section 4 of the Investment Management Agreement provides that State Street shall be entitled to rely on the documents governing the Plan and the Investment Guidelines so long as it does not violate ERISA, securities laws and other applicable laws.   The Investment Guidelines in Exhibit A to the Agreement prescribes that the EDS Stock will be invested primarily in the Employer Stock unless State Street, in its discretion, determines that it is in the best interest of the Plan participants to sell all or any portion of the shares.   [See EDS-E0003083].

33.   State Street did in fact monitor EDS stock through their Investment Officer assigned to the stock and their committees that provide fiduciary guidance and performs an oversight function for State Street.   The Company Stock Management Group monitors employer stock for all of its clients that hold employer stock in their plan trusteed or managed by State Street.   In addition, there is a Watchlist Committee that is comprised of senior officers within the Stock Management Group as well as a Risk Management Officer.   The purpose of the Watchlist Committee is to monitor the financial performance of client companies and, if there are concerns regarding a company, to gain an understanding of the company's current situation.   I reviewed records of the Watchlist Committee and State Street's Investment Officer for EDS stock, indicating they reviewed EDS' stock

performance on a weekly basis from May 3, 2002 until the last day for which documents were provided of March 4, 2005.

34. EDS' stock was monitored closely throughout the second half of 2002, but the Watchlist Committee ultimately decided *not* to add EDS stock to the Watchlist during this period, despite the September 18, 2002 earnings warning by EDS that resulted in its stock losing over 50% of it value the next day. For example, on October 24, 2002, a report on EDS was presented to the Watchlist Committee. Bates No. EDSSS-0000113 to 117. The Watchlist Committee reviewed EDS's net sales (by quarter) from 1998 to 2002, earnings per share (by quarter) from 1998 to 2002, analyst opinions, and other items. See EDSS-0000115 to 117. Based on a consideration of these factors, the recommendation of the report was that EDS stock did not warrant being placed on the Watchlist. See EDSSS-0000115. At its November 21, 2002 meeting, the Watchlist Committee decided to continue monitoring EDS' stock closely, but not to add it to the Watchlist. See Bates No. EDSSS-0000118; and Bates No. EDSSS-0000120-122.

35. In fact, the Watchlist Committee did not put EDS Stock on their Watchlist until July 23, 2004 and advised EDS of that in writing on August 10, 2004. At that time the Watchlist Committee communicated its action to EDS as follows:

> The watchlist identifies stocks for which State Street has a heightened level of concern and which therefore entails the highest level of monitoring by State Street. As such, we may be contacting you from time to time to review the work EDS is performing and to ensure that the stock continues to be a prudent investment under ERISA. (EDSSS-0000137).

22

As the above communication indicates, at that time (August 2004), even though the Watchlist Committee placed EDS' stock on the Watchlist, the Watchlist Committee believes that EDS stock continues to be a prudent investment under ERISA.

**F.    Conclusion**

36.    Based on my experience and review of the pertinent evidence, the CBC made appropriate appointments to the BAC and the IC. They appointed people experienced in finance and plan administration.    ERISA specifically permits employees to serve in these roles and, based on my experience, this is a common practice as it defrays plan expenses associated with outsourcing these functions. Simply put, participants are not charged expenses for the handling of these duties by ERISA fiduciaries who are EDS employees. Also of significance, for the one area in which there could be a potential for conflict between management and participants, i.e., in the management of the Stock Fund, the Investment Committee put in place what is considered "best practices" by outsourcing the management and administration of the Stock Fund (including the management of its investments) to the independent financial institutions, Vanguard, then State Street. As Investment Managers for the Stock Fund, each was required by law to be independent ERISA fiduciaries with obligations to act prudently and solely in the interests of participants.

37.    The CBC only served as a fiduciary with respect to the appointments to and removals of the members of the BAC and IC. Based on my experience and review of the pertinent evidence, CBC did appropriately monitor those appointments by receiving annual reports from the BAC and IC and special updates such as the

23

one in February 2002 regarding the upcoming suspension in participant direction as the record-keeping function transferred from Vanguard to Hewitt. I saw no evidence that the CBC knew or should have known anything was amiss with the Plan that would have triggered any heightened monitoring role. The Stock Fund is required by the Plan document and its offering was not unusual, as it is an investment favored under ERISA and the Internal Revenue Code and the vast majority of large public companies offer their stock as investment options in 401(k) or like plans. The Stock Fund was specifically designed to invest primarily in and track the performance of EDS Stock. Thus, that the Stock Fund did this was not unusual. As noted, the fiduciary management of this Stock Fund has been delegated to independent financial institutions, so that there was no reasonable concern that potential conflicts might have impaired the Stock Fund's management. The notion that the CBC should have instructed the IC to override plan terms also makes no sense under the structures put in place by ERISA. In its corporate Settlor role, the CBC acts as gatekeeper for suggesting changes to the Plan's terms, and under ERISA, the CBC cannot be challenged as a fiduciary regarding it's setting of those very same plan terms. Large companies often offer their stock as a plan investment option because, as Settlors, they conclude this serves their business interests. ERISA and the Internal Revenue Code encourage this investment through tax incentives and by excluding investments in employer stock from any duty to diversify.

38. As for the whether the fiduciaries should have followed the Plan terms and participant directions on investing in the Stock Fund, the IC executed Investment Management Agreements with Vanguard and State Street to serve as investment

24

manager of the Stock Fund pursuant to ERISA Section 3(38). As such Vanguard and State Street served as independent fiduciaries with complete discretion over management and investment of the Stock Fund. Consequently, the BAC and the IC were not responsible for the Stock Fund, except for the IC's cabined duties to monitor the appointment of Vanguard and State Street.

39.     Based on my experience as an employee benefits professional for over 30 years and the documents submitted for my review, the governance structure for the Plan was consistent with sound plan administration and followed prudent fiduciary processes. I also believe that the appointment of an independent fiduciary to oversee the EDS Stock Fund was a prudent course of action and was based on a prudent fiduciary process and did relieve the BAC, IC and CBC of all fiduciary duties and liability regarding the prudence of investing in the Stock Fund except for the IC's duty to monitor these appointments. Consequently, I believe the BAC, IC and CBC all fulfilled their duties to the Plan participants with respect to the Stock Fund.

# V.     DID THE PLAN PROVIDE SUFFICIENT INFORMATION TO THE PARTICIPANTS?

## A.     ERISA Section 404(c)

40.     ERISA Regulations Section 404(c) provides that if the fiduciaries of a 401(k) plan do certain things, they are exempted for liability for the individual participant's investment decisions. The basis tenets of 404(c) are:

- Participants must exercise independent control of their investments. The Plan allows participants to exercise full control of their individual accounts.

25

- Participants must be offered a portfolio of investment options running the risk-return spectrum so that each participant can select his own investment portfolio that meets his individual risk-return preferences. The Plan provided 13 and then 17 investment options plus a self-directed brokerage account.

- Participants must be able to change their portfolio at least quarterly. The Plan allows participants to change their investment portfolio on a daily basis through the record-keeper's website or by calling their toll free number.

- Special rules for employer stock concerning disclosure of information and voting rights. EDS provides this information in the Plan Prospectus.

- The Plan must disclose sufficient information so the participants can make informed investment decisions. This will be discussed in greater detail below, but my conclusion is that the participants were furnished more than sufficient information to make an investment decision and were cautioned about investing in the Stock Fund.

Participants must be provided certain information and other information must be available upon request. Each participant must receive:

- A notice that the Plan intends to be a Section 404(c) plan- The Plan participants are given notice that the Plan is a 404(c) plan in the EDS Enrollment Guide and in the Plan Prospectus and the Benefits Handbook. The Plan Document also contains the required notice.

26

- A description of each investment option- This information is provided in the Benefits Handbook, on the record-keepers website and in the fund summaries that are furnished to the participants for each of the investment options.

- Information on how to give investment instructions- This information is provided in the Benefits Handbook and on the record-keepers website

- A description of transaction fees and expenses- This information is provided in the Benefits Handbook, on the record-keepers website and in the fund summaries that are furnished to the participants for each of the investment options.

In addition, participants may request additional information about the investment options.  It is important to note that Section 404(c) does not require investment education or advice, only sufficient information so the participant can make an informed investment decision.


**B.     Investment Education**

41.     Even though investment education is not required, U.S. Department of Labor Interpretative Bulletin 96-1 (I.B. 96-1) was designed to provide a safe harbor to plan fiduciaries for providing participant education.  Many fiduciaries were concerned that they could be deemed to be rendering investment advice and subject to fiduciary liability for such advice.   I.B. 96-1 indicates the following information does not constitute advice:

27

- Plan information about the benefits of participation, the terms of the plan, the benefits of increasing plan contributions and the impact of plan withdrawals.

- Description of the investment objectives, risk and return characteristics and historical performance for each investment option under the plan.

- General investment information, which is not plan specific explaining general concepts such as risk and return, diversification, dollar cost averaging, the benefits of compounding and the tax advantages of a tax deferred program. Also, explanations concerning the historical differences in the performance of different asset classes, the effects of inflation, estimating future retirement needs, time horizons and assessing risk tolerance.

- Asset allocation models for hypothetical individuals with different time horizons and risk tolerances and take into account the historic returns of the various asset classes over defined time periods.

- Interactive investment materials such as questionnaires, worksheets or software that allow a participant to estimate retirement needs and analyze the impact of different asset allocations.

I reviewed several binders of communication materials that were sent to Plan participants and did not see anything that appeared outside of the safe harbor provided by I.B. 96-1. Both Vanguard and Hewitt, as Plan record-keepers, provided quarterly written educational materials in addition to webcasts and live presentations. Participants were also provided investment education through the "For Your Benefit"

28

newsletters, individualized letters, postcards and on their Intranet. Consequently, although not required, the fiduciaries provided much more information than required by ERISA Regulations Section 404(c) and provided a wealth of investment education materials within the scope of I.B. 96-1.

## C.    Information to the Participants about the Stock Fund

42.    The Plan Prospectus contained in the EDS U.S. Benefits Handbook states on page 3 that "not all employees are necessarily in the financial position to take the risk that goes with withdrawal restrictions imposed by the Plan and with ownership of stock or other investment interest represented by participation in the Plan. Therefore, you should consider your financial condition carefully in making the decision to contribute to the Plan." [See EDS-E0001244]  On page 6 of that document participants are cautioned that because the EDS Stock Fund " concentrates on a single stock, the fund is considered riskier than a diversified stock mutual fund." [See EDS-E0001247]  On page 9, participants are told "You are solely responsible for the selection of your investment options.  None of the Trustee, any appointed fiduciary, the Plan Administrator or EDS, or their directors, officers, or employees, are empowered to advise you as to the manner in which investments should be made, nor are they responsible for any investment decisions made by you. The fact that a fund is available for investment under the Plan shall not be construed as a recommendation for investment in that fund." [See EDS-E0001249]

43.    The Fund Fact Sheets for the Stock Fund prepared by Vanguard advised " A company stock fund is more risky than the average stock mutual fund

29

because it depends solely on the performance of a single stock. Stock mutual funds generally hold the stock of many companies and are not dependent on a single company. Therefore, investors should limit their company stock investments to a portion of their overall savings." On a scale of 1 to 5, Vanguard rated the EDS Stock Fund as a 5, the rating with the greatest risk.          [See EDS-E0005698, 5725,5776,5617]

44.    After State Street became the investment manager for the Stock Fund in May 2002, the Fact Sheet indicated the risk associated with the Fund was beyond 5 on a linear scale of risk from 1 to 5. The Fact Sheet stated, " A fund concentrated in a single stock has a great price variability than a well-diversified stock fund. "[See EDS-E0006314]

45.    Participants were provided questionnaires they could complete to determine their risk tolerance by either Vanguard or Hewitt as the Plan record-keeper. [See EDS-E05633-5635, 5596-5597, 5488, 7442]

46.    In an EDS Publication mailed to participants by Vanguard in October 1998, participants were told, " As a result of the EDS-matching contributions, there's a chance that a significant amount of your account's assets could be invested in EDS Stock. Remember, any company stock fund is tied to the performance of a single company and is inherently riskier than a diversified mutual fund that may invest in many, even hundreds, of different stocks. This may be a good time to look at your investment mix to see if it still reflects your savings objectives. A Vanguard Participant Services Associate can help with reviewing your mix." [EDS-E0005738]

47.     In an EDS brochure titled "Time Flies" which was sent to all participants in February 1999, all of the investment funds available to participants were described.  The EDS Stock Fund was depicted as the most aggressive fund in terms of risk and participants were reminded that the Fund was "considered riskier than a stock mutual fund, which is more diversified." [EDS-E0005595]

48.     In an EDS brochure titled "Your New and Improved EDS 401(k) Plan" sent to all participants at the end of May 2002 to tell the participants about the change in record-keeper from Vanguard to Hewitt, participants were again reminded that the Stock Fund is riskier than a diversified fund and it's overall risk level is Very Aggressive.  [EDS-E0000807]

**D.     Participant Reaction to EDS Stock Decline on September 19, 2002**

49.     On June 30, 2002 participants were allocating 14.5% of their contributions into the EDS Stock Fund.  By September 30, 2002 this had declined to 8.9% of their contributions.  However, after the decline of September 19, 2002 the participants apparently saw the decline as a buying opportunity and invested an additional $5m on September 23, $2.7m on the 24th, $2.1m on the 25th, $2.8m on the 27th and $4.2m on the 30th.  I believe this shows the Plan participants had received sufficient investment education to understand that this was a buying opportunity for the EDS stock and were subsequently rewarded for their investment acumen.

31

## E. Conclusion

47. I believe the IC actions were consistent with sound plan administration and followed prudent fiduciary practices regarding providing participants a diversified portfolio of investment options that allowed each participant to select his or her individual risk-return preference. I believe the Plan complied with ERISA Section 404(c) and provided the required information to the participant. In addition, I believe the participants were provided sufficient information upon which to make an informed decision regarding their portfolio. Plan fiduciaries actions were consistent with sound plan administration and followed prudent fiduciary practices regarding educating the plan participants on the basic risk-return characteristics of those investment options and the need to diversify their portfolio to avoid the risk of large losses. The fiduciaries went to great lengths to provide investment education to the participants through their communication strategy. They hired professionals well versed in such matters to advise the Plan and the participants about investment and retirement planning. Therefore, I believe that the Plan did provide sufficient information to the participants about all of the investment options, including the Stock Fund. In fact, it is clear to me that the Plan went to great lengths to describe the inherent risks of investing in the Stock Fund to all of the participants.

50. In accordance with the Federal Rules of Civil Procedure, I have enclosed a statement of my qualifications and those cases in which I have testified in recent years. My fee for these services is based on an hourly rate of $300. I have also enclosed a list of the documents I reviewed to prepare my report. ( Exhibit B)

32

51.     I understand that discovery is ongoing and the review of additional documents may be requested.  If so, I reserve the right to supplement or modify my opinions based on new evidence presented.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on April **21**, 2005

BRUCE D. RUUD, CEBS, CFP, CMFC, CRPS

33